**AFFIRM in Part, REVERSE in Part, and REMAND; Opinion Filed June 17, 2015.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-14-00479-CV

**SHARLET O. MITCHELL, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF JOHN MITCHELL AND ALL BENEFICIARIES AND HEIRS OF JOHN MITCHELL, DECEASED; DONNA MITCHELL; AND JOHN MITCHELL, JR.,**
**Appellants**
**V.**
**NUGGEHALI NEIL SATYU, M.D., AND ZAHOUR AHMED, M.D., Appellees**

**On Appeal from the County Court at Law No. 4**
**Dallas County, Texas**
**Trial Court Cause No. CC-13-03855-D**

## MEMORANDUM OPINION
Before Justices Fillmore, Stoddart, and Whitehill
Opinion by Justice Fillmore

In this interlocutory appeal, appellants Sharlet O. Mitchell, individually and as representative of the Estate of John Mitchell and all beneficiaries and heirs of John Mitchell, Donna Mitchell, and John Mitchell, Jr., challenge the trial court's dismissal of their health care liability claims against appellees Nuggehali Neil Satyu, M.D., and Zahour Ahmed, M.D. In a single issue, appellants contend the trial court abused its discretion by concluding the expert reports in this case fail to comply with the requirement of civil practice and remedies code section 74.351 that an expert report demonstrate a causal relationship between the failure of a physician or health care provider to meet an applicable standard of care and the injury, harm, or damage claimed. We affirm the trial court's order dismissing with prejudice appellants' health

care liability claims against Ahmed. We reverse the trial court's order dismissing with prejudice appellants' health care liability claims against Satyu, and we remand those claims against Satyu to the trial court for further proceedings consistent with this opinion.

**Background**

*Factual Allegations*

Appellants sued appellees and other defendants for negligence and gross negligence related to the death of John Mitchell (Mitchell) following his presentation to and admission at Renaissance Hospital of Terrell (Renaissance Hospital). Appellants allege appellees failed to exercise reasonable care in the provision of medical services and treatment to Mitchell. Given the procedural posture of this case, we draw the facts from the allegations against appellees in appellants' live petition in the trial court.

Mitchell was seventy-two years of age at the time of his treatment at Renaissance Hospital. He arrived at the hospital's Emergency Department on September 5, 2012, with aspiration pneumonia, dehydration, hypernatremia, elevated blood pressure secondary to physiological stress, tachycardia (heart rate over 100 beats per minute), tachypnea (respiratory rate greater than twenty breaths per minute), shortness of breath, a sacral decubitus ulcer, and fever, and without a functional gastrostomy tube.

Ahmed was the first physician to evaluate Mitchell in the Emergency Department. In addition to ordering a chest x-ray, Ahmed ordered the following tests: a complete blood count, a comprehensive metabolic panel, cardiac markers, a urinalysis, and a blood culture. Around 7:00 p.m., which was a couple of hours after Mitchell's arrival at Renaissance Hospital, Ahmed's shift ended, and Ahmed transferred Mitchell's care to Niaz Farhat, M.D.

According to appellants, upon Mitchell's arrival at the Emergency Department of the hospital, he should have been evaluated by Ahmed for Systemic Inflammatory Response

Syndrome (SIRS), a syndrome rendering patients likely to develop more significant illness, such as systemic inflammation, sepsis, organ dysfunction, and overt organ failure. Appellants allege Ahmed's failure to diagnose Mitchell with SIRS and sepsis "kept Mitchell from receiving care at the level he required and caused his death." Appellants assert that, given Mitchell's condition, he should have been transferred by Ahmed to another hospital and admitted to a functional intensive care unit (ICU) where he would have been placed on a cardiac monitor that would allow for early detection and initiation of treatment to correct abnormal heart rate, respiratory rate, blood pressure, and oxygen saturation. Without such monitoring, Mitchell went "hours and days" without oxygen therapy and medication to reduce his heart and respiratory rate, which caused him to experience respiratory failure and cardiac arrest. Ahmed's breaches of the applicable standards of care were allegedly the proximate cause of Mitchell's death.

Appellants allege Satyu, Mitchell's attending physician at the hospital, was primarily responsible for Mitchell's care once Mitchell was transferred from the Emergency Department to a medical-surgical floor. According to appellants, Satyu should have diagnosed Mitchell's SIRS and sepsis and transferred him to a functioning ICU. Appellants allege Satyu failed to:

- ensure Mitchell's [gastrostomy tube for] enteral access was functional;
- provide free water to correct dehydration and hypernatremia;
- determine the specific type of pneumonia [Mitchell] had;
- send serology for various fungal, viral and bacterial agent identification;
- order sputum cultures;
- order mucolytic agents;
- order advanced radiological studies such as a CAT scan of the chest;
- consult a pulmonologist;
- consult a critical care physician;
- use appropriate doses of intravenous antibiotics;
- provide ventilator support;
- be available and reachable;
- ensure that if he was covered by another physician, the other physician was available; and
- provide blood pressure support.

Satyu's failures to appropriately assess and provide care allegedly prevented Mitchell from receiving treatment that "would have made [Mitchell] better." According to appellants, because of Satyu's lapse in medical interventions, Mitchell suffered declining health, "namely the progression from pneumonia dehydration to hypoxemia, hypotension/shock, multisystem organ dysfunction, and cerebral anoxia and he died." Satyu's breaches of the applicable standards of care were allegedly the proximate cause of Mitchell's death.

*Procedural History*

Prior to the expiration of appellants' 120-day expert report deadline under section 74.351(a) of the civil practice and remedies code, appellants served appellees with the initial expert report of Charles Grodzin, M.D. (Grodzin's initial report). *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a) (West Supp. 2014). Appellees objected to the sufficiency of this report.[1] Appellants served appellees with a supplemental report of Grodzin (Grodzin's second report). Appellees objected to the sufficiency of Grodzin's second report and moved to dismiss appellants' claims based on the asserted insufficiency of Grodzin's reports. Appellees also requested that the trial court award them their reasonable attorneys' fees and costs. After hearing appellees' motions to dismiss, the trial court found Grodzin's reports were deficient with respect to causation. The order signed by the trial court included the following:

> Dr. Grodzin maintains John Mitchell should be alive today because Mitchell had a treatable and reversible condition. We also know Mitchell's cause of death was aspiration pneumonia, which lead [sic] to respiratory arrest, cardiac arrest, and cerebral anoxia. Dr. Grodzin has outlined what he believes were multiple breaches in the appropriate standard of medical . . . care by Satyu . . . [and] Ahmed . . . . What he must do now, within a reasonable degree of medical probability, is clearly and specifically explain the causal relationship between the alleged malpractice of each defendant and the harm alleged (an untimely death). Dr. Grodzin's opinions are at this point, conclusory.

---

[1] The record reflects that defendants Farhat and Miklos Major, II, N.P., also filed objections to appellants' expert report. However, Farhat and Major are not parties to this appeal.

–4–

The trial court granted appellants a thirty-day extension to cure the deficiency in these reports. *See id*. § 74.351(c).

Appellants thereafter served appellees with the second supplemental report of Grodzin (Grodzin's third report). *See id*. § 74.351(i). Appellees objected to the sufficiency of Grodzin's reports as failing to sufficiently set forth a causal link between their conduct and Mitchell's death, and they moved for dismissal of appellants' claims against them with prejudice. After a hearing, the trial court granted appellees' objections and dismissed appellants' claims against them with prejudice. *See id*. § 74.351(b)(2).

Appellants timely filed this interlocutory appeal challenging the trial court's order granting appellees' objections to Grodzin's reports and dismissing appellants' claims against them with prejudice. *See id*. § 51.014(a)(10) (West 2015). Appellants filed a motion for reconsideration in the trial court, which the trial court denied.

**Standard of Review**

We review a trial court's order on a motion to dismiss a health care liability claim based on the sufficiency of an expert's report for an abuse of discretion. *Van Ness v. ETMC First Physicians*, No. 14-0353, 2015 WL 1870051, at \*1 (Tex. Apr. 24, 2015) (per curiam); *Nexion Health at Terrell Manor v. Taylor*, 294 S.W.3d 787, 791 (Tex. App.—Dallas 2009, no pet.). We must defer to the trial court's factual determinations if they are supported by the evidence, but review its legal determinations de novo. *Van Ness*, 2015 WL 1870051, at \*1. A trial court has no discretion in determining what the law is or in applying the law to the facts. *Sanchez v. Martin*, 378 S.W.3d 581, 587 (Tex. App.—Dallas 2012, no pet.). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to guiding rules or principles. *Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010).

**Analysis**

In their sole issue on appeal, appellants contend the trial court abused its discretion by (1) concluding that as to appellees, Grodzin's expert reports fail to comply with the requirement of civil practice and remedies code section 74.351 that an expert report demonstrate a causal relationship between the failure of a physician or health care provider to meet an applicable standard of care and the injury, harm, or damage claimed; and (2) dismissing their claims against appellees.

*Applicable Law*

Chapter 74 of the civil practice and remedies code governs health care liability claims. *Brewster v. Columbia Med. Ctr. of McKinney Subsidiary, L.P.*, 269 S.W.3d 314, 316 n.3 (Tex. App.—Dallas 2008, no pet.). Under the version of Chapter 74 applicable to this case, any person who brings suit asserting a health care liability claim must, within 120 days of filing the original petition, provide an expert report for each physician or health care provider against whom a health care liability claim is asserted. *See* Act of May 18, 2005, 79th Leg., R.S., ch. 635, § 1, sec. 74.351(a), 2005 Tex. Gen. Laws 1590, 1590 (amended 2013) (current version at TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a)).[2] An "expert report" is defined as a written report that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards of care, and the causal relationship between that failure and the injury, harm, or damages claimed. *Id*. § 74.351(r)(6); *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 51 (Tex. 2002) (per curiam). Although a claimant must timely file an adequate expert report as to each defendant in a health care liability suit, Chapter 74 does not require an expert report as

---

[2] The statute has since been amended to require service of the reports "not later than the 120th day after the date each defendant's original answer is filed." *See* Act of May 26, 2013, 83rd Leg., R.S., ch. 870, § 2, sec. 74.351(a), 2013 Tex. Gen. Laws 2217, 2217.

to each liability theory alleged against that defendant. *TTHR Ltd. P'ship v. Moreno*, 401 S.W.3d 41, 45 (Tex. 2013); *Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 632 (Tex. 2013). A report is deficient if it states only the expert's conclusions about the standard of care, breach of the standard of care, or causation. *See Ortiz v. Patterson*, 378 S.W.3d 667, 671 (Tex. App.—Dallas 2012, no pet.).

A trial court shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of "expert report" in section 74.351(r)(6). TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(*l*); *see also Loaisiga v. Cerda*, 379 S.W.3d 248, 260 (Tex. 2012). To represent an objective good faith effort to comply with statutory requirements, the expert report must (1) inform the defendant of the specific conduct the plaintiff has called into question, and (2) provide a basis for the trial court to conclude that the claims have merit. *Loaisiga*, 379 S.W.3d at 260; *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 879 (Tex. 2001) (decided under section 13.01 of the predecessor statute, the Medical Liability and Insurance Improvement Act, previously codified at article 4590i of the Texas Revised Civil Statutes). If a report omits any of the statutory elements of section 74.351(r)(6), it cannot be a good faith effort. *Palacios*, 46 S.W.3d at 879.

A causal relationship is established by proof that the negligent act or omission was a substantial factor in bringing about the harm, and that, absent this act or omission, the harm would not have occurred. *Costello v. Christus Santa Rosa Health Care Corp.*, 141 S.W.3d 245, 249 (Tex. App.—San Antonio 2004, no pet.). Causation is generally established in medical malpractice cases through evidence of a "reasonable medical probability" or "reasonable probability" that the alleged injuries were caused by the negligence of one or more defendants; in other words, the plaintiff must present evidence "that it is 'more likely than not' that the ultimate

harm or condition resulted from such negligence." *Jelinek*, 328 S.W.3d at 532–33 (quoting *Kramer v. Lewisville Mem'l Hosp.*, 858 S.W.2d 397, 399–400 (Tex. 1993)). An expert may show causation by explaining a chain of events that begins with a defendant doctor's negligence and ends in injury to the plaintiff. *See McKellar v. Cervantes*, 367 S.W.3d 478, 485 (Tex. App.—Texarkana 2012, no pet.). An expert report must explain "to a reasonable degree, how and why the breach [of the standard of care] caused the injury based on the facts presented." *Jelinek*, 328 S.W.3d at 539–40; *see also Van Ness*, 2015 WL 1870051, at *1 ("An expert must explain, based on facts set out in the report, how and why the breach caused the injury."). The report must not be conclusory in its explanation of causation; it "must explain the basis of [the expert's] statements to link his conclusions to the facts. *Bowie Mem'l Hosp.*, 79 S.W.3d at 52; *see also Taylor v. Fossett*, 320 S.W.3d 570, 575 (Tex. App.—Dallas 2010, no pet.) (expert report must contain sufficiently specific information to demonstrate causation beyond conjecture); *Arkoma Basin Exploration Co. v. FMF Assocs. 1990–A, Ltd.*, 249 S.W.3d 380, 389 n.32 (Tex. 2008) (quoting BLACK'S LAW DICTIONARY 308 (8th ed. 2004)) (defining "conclusory" as "[e]xpressing a factual inference without stating the underlying facts on which the inference is based"). An expert's mere conclusion that "in medical probability" one event caused another differs little, without an explanation tying the conclusion to the facts, from an *ipse dixit*, which the supreme court has consistently criticized. *Jelinek*, 328 S.W.3d at 539.

In determining whether the expert report represents a good faith effort to comply with the statutory requirements, the court's inquiry is limited to the four corners of the report. *Sanchez*, 378 S.W.3d at 588; *Christian Care Ctrs., Inc. v. Golenko*, 328 S.W.3d 637, 641 (Tex. App.—Dallas 2010, pet. denied) (citing *Palacios*, 46 S.W.3d at 878).[3] "We may not 'fill gaps' in an

---

[3] The expert report requirement may be satisfied by utilizing more than one expert report, and a court may read the reports together. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(i); *Heart Hosp. of Austin v. Matthews*, 212 S.W.3d 331, 335–36 (Tex. App.—Austin 2006), *aff'd*, *Ogletree v. Matthews*, 262 S.W.3d 316 (Tex. 2007) (because section 74.351(i) allows a plaintiff to address required statutory elements with more

expert report by drawing inferences or guessing what the expert likely meant or intended." *Hollingsworth v. Springs*, 353 S.W.3d 506, 513 (Tex. App.—Dallas 2011, no pet.). "We determine whether a causation opinion is sufficient by considering it in the context of the entire report." *Ortiz*, 378 S.W.3d at 671.

*Application of the Law*

The question presented is whether Grodzin's expert reports collectively provided enough factual explanation to render his causation opinions nonconclusory; that is, whether Grodzin's reports supply the "how and why" of a causal relationship between appellees' purported breaches of the applicable standards of care and Mitchell's death. *See Jelinek*, 328 S.W.3d at 539–40.[4]

Ahmed argues Grodzin's reports never explain in a non-conclusory manner how Ahmed's limited role in Mitchell's care proximately caused Mitchell's death. Ahmed contends Grodzin did not explain how Mitchell "being in an ICU would treat the serious medical conditions that caused [Mitchell's] death."

Satyu argues appellants' expert's reports are deficient because they do not provide information on causation sufficient to allow the trial court to conclude appellants' claims against Satyu have merit. Satyu asserts Grodzin's causation opinions are conclusory in nature and are not linked to the underlying facts.

According to Grodzin's initial report, "[s]ince it was obvious that the full spectrum of care at Renaissance Hospital was not available" for Mitchell, the decision should have been made by Ahmed and Satyu to transfer Mitchell to a facility "that had the resources to take care of his presenting problems and had ICU availability should he get worse (which he did)." Grodzin

---

than one report, a plaintiff's case will not be dismissed simply because each individual report, viewed on its own, does not fully satisfy each statutory element).

[4] Appellants do not contest that their claims against Ahmed and Satyu are medical malpractice claims subject to the requirements of chapter 74 of the civil practice and remedies code. On appeal, appellees do not contend Grodzin was not qualified to render opinions regarding appellees' care and treatment of Mitchell, nor do appellees contend Grodzin incorrectly stated the standards of care applicable to their care and treatment of Mitchell.

opined the failure to provide Mitchell with an appropriate level of care by transferring him to another acute care facility was a breach of the applicable standard of care by Ahmed and Satyu. Grodzin asserted additional breaches of the standard of care by Satyu: incorrect treatment of Mitchell for hypernatremia, failure to "appropriately dose" antibiotic medication for treatment of Mitchell's pneumonia; failure to stabilize Mitchell's hemodynamic status and to obtain a critical care consultation for treatment of Mitchell's hemodynamic status; and failure to recognize, evaluate, and treat Mitchell's metabolic acidosis. Grodzin stated that, [t]ogether, the breaches of the standard[s] of care . . . cumulatively,[5] are the proximate causes" of Mitchell's death, and if Mitchell "would have been treated appropriately," Grodzin "believe[d] Mitchell would have survived."

In supplementation of his initial report, Grodzin opined in his second report that Ahmed's and Satyu's negligent care of Mitchell, as well as the negligent care by Farhat and two nurses, "all caused" Mitchell's death because "they cumulatively failed in bringing an adequate level of medical care" to Mitchell. Grodzin stated that Mitchell's illness was treatable and reversible and but for these "cumulative negligent contributions," Mitchell "would be alive today," barring any other unforeseen events. Grodzin opined that Ahmed "contributed to the cause" of Mitchell's death because Ahmed knew or should have known the hospital, its staff, and "involved physicians" could not provide proper care of Mitchell. According to Grodzin, Ahmed should not have permitted Mitchell to be admitted to the hospital and should have assured Mitchell was transferred to another hospital in order to receive the care he needed. Grodzin opined that had Ahmed "made the right decision in this regard, it is medically probable [Mitchell] would be alive today" because his illness was treatable and reversible, and Ahmed's decision to allow Mitchell

---

[5] In addition to the breaches of the standards of care Grodzin set out with regard to Ahmed and Satyu, Grodzin opined in his initial report regarding breaches of the standards of care by the owner of Renaissance Hospital, Tariz Mahmood, M.D., as well as vicarious liability of the hospital for the breaches of the standards of care by hospital nursing staff.

to be admitted to the hospital without the resources to take care of Mitchell "added to the cause" of Mitchell's death. In Grodzin's medical opinion, had Satyu treated Mitchell with "medically competent skill and decision making," Mitchell "would have lived through this illness because his disease was treatable and reversible and, barring any unforeseen circumstances, would be alive today as his recovery depended on correct medical care." Grodzin stated that "but for [Satyu's] negligent decision making and breaches of the standard of care," Mitchell "would have survived this illness and be alive today because his illness was treatable and reversible."

The purpose of Grodzin's third report was "to provide further explanation on [sic] the relationship between negligent acts and/or omissions" of Ahmed and Satyu and Mitchell's death. Grodzin stated Mitchell died of "dehydration which led to hypernatremia and aspiration pneumonia, which led to hypoxemia, sepsis, respiratory arrest, multi-organ dysfunction, cardiac arrest and cerebral anoxia." Grodzin's complaints in his third report with regard to Ahmed's care and treatment of Mitchell are that because Ahmed failed to diagnose Mitchell with SIRS or sepsis and transfer Mitchell to another hospital with a functional ICU, Mitchell's medical condition declined and he died. According to Grodzin, the fact that Ahmed did not diagnose Mitchell with SIRS or sepsis prevented Mitchell from receiving care at the level he required and caused his death. "Mitchell's pneumonia got worse, his lungs filled up with fluid, he went into respiratory failure, develop[ed] hypoxemia (too little oxygen in his blood), became hypotensive and went into multi-organ dysfunction and cerebral anoxia which led him to die." To "illustrate" how failure to transfer Mitchell to another hospital's ICU affected his condition and caused his death, Grodzin compared the care Mitchell received at Renaissance Hospital and the care he would have received at a functioning ICU at another hospital: Mitchell would have been on a cardiac monitor which would have monitored heart rate, respiratory rate, blood pressure, and oxygen saturation, and would have alarmed if these parameters were outside normal limits,

allowing for early detection and initiation of treatment and intervention; advanced nurses with training and experience in caring for critically ill patients would have been able to detect early signs of deterioration; and respiratory therapy would have been provided to prevent Mitchell from experiencing respiratory failure.

While Grodzin's third report contains information regarding the deterioration of Mitchell's vital signs in the period from 11:57 p.m. on September 5, 2012 to the date of his death on September 8, 2012, his first reference to Mitchell's physiological condition relates to a point in time almost five hours after Mitchell was under Ahmed's care in the Emergency Department. Grodzin noted Mitchell's heart rate was 107 beats per minute at 11:57 p.m. on September 5, 2012, and had increased to 114 beats per minute the morning of September 6, 2012. Grodzin opined that, had Mitchell been monitored in a functional ICU, medication would have been provided to return Mitchell's heart rate to normal, which, in medical probability, would have prevented Mitchell from experiencing cardiac arrest and death. Grodzin noted the medical records indicate that at 11:55 p.m. on September 7, 2012, Mitchell temperature was elevated and he was grimacing in pain. At 1:00 p.m. on September 8, 2012, Mitchell had sudden onset of breathing difficulties, his respiratory rate rose, his oxygen saturation fell, his blood pressure was elevated, his pulse rate was 148 beats per minute, he had a temperature of 98.9 degrees, and he was sweating. Grodzin stated that, given Mitchell's difficulties with breathing and pain, his physical condition had deteriorated significantly since his presentation in the Emergency Department. Grodzin opined that had Mitchell had constant physiological monitoring, medical personnel would have been alerted when his oxygen saturation dropped and his respiratory rate increased, and he would have received oxygen therapy, preventing him from going into respiratory failure, and medical personnel would have been alerted when his pulse rate increased, and he would have received medication to prevent cardiac arrest. According to Grodzin, without

–12–

physiological monitoring, Mitchell went "hours and days" without oxygen therapy or medication to reduce his pulse rate and respiratory rate, "which caused him to go into respiratory failure and cardiac arrest as a result of his underlying pneumonia, hypoxemia, SIRS, sepsis and subsequent shock."

As the first physician to evaluate Mitchell at the hospital, Ahmed's assessment of Mitchell was that he suffered from aspiration pneumonia. Based on that initial assessment, Ahmed ordered a battery of tests and a chest x-ray. About two hours after Mitchell arrived at the Emergency Department, Ahmed's shift ended and Mitchell's care was assumed by Farhat, another physician in the Emergency Department. Grodzin assumes that, had Ahmed immediately transferred Mitchell to another health care facility, Mitchell would have been admitted to the ICU of the facility and physiological monitoring would have resulted in interventions of oxygen therapy and medication that would have prevented Mitchell's respiratory failure and cardiac arrest. However, Grodzin provides no basis for an inference or assumption that Ahmed had reason to believe adequate physiological monitoring of Mitchell would not be provided in the Emergency Department, or a medical-surgical floor at Renaissance Hospital, following the end of Ahmed's shift. Nor does Grodzin provide a basis for an inference or assumption that Ahmed had reason to believe if he did not transfer Mitchell to another hospital before the end of his shift, no other health care provider at Renaissance Hospital would subsequently do so if necessary. Ahmed's care and treatment of Mitchell did not dictate the health care rendered by Mitchell's subsequent health care providers at Renaissance Hospital. Indeed, in Grodzin's initial report, he criticized Satyu for failing to transfer Mitchell to another hospital after Satyu undertook responsibility for Mitchell's care and treatment.

In the section of his third report discussing Ahmed's care of Mitchell, Grodzin also discusses the functionality of Mitchell's gastrostomy tube. At 10:00 p.m. on September 5, 2012,

–13–

Mitchell was no longer in the Emergency Department, having been admitted to Renaissance Hospital and moved to a medical-surgical floor. A little more than an hour later, a nurse noted a problem with Mitchell's gastrostomy tube. Grodzin stated that Mitchell, already assessed with aspiration pneumonia, should not have been left with a malfunctioning gastrostomy tube that placed him at increased risk of respiratory failure, "which he ultimately suffered, resulting in his death." According to Grodzin, had the gastrostomy tube functioned correctly, "in medical probability, [Mitchell] would not have aspirated and his lungs would not have continued to fill up with fluid" and would not have "set the stage for worsening of his pneumonia which led to hypoxemia, SIRS, sepsis, multiorgan failure and death." However, Grodzin in no way causally connects this discussion to Ahmed's care of Mitchell in the Emergency Department.

Further, with regard to his statement that Mitchell went "hours and days" without oxygen therapy or medications to reduce his pulse rate and respiratory rate, which caused Mitchell to experience respiratory failure and cardiac arrest, Grodzin provides no basis for an inference or assumption that Ahmed's failure to diagnose SIRS or sepsis or to initiate oxygen therapy or medications within the first two hours of Mitchell's presentation at the Renaissance Hospital Emergency Department was a substantial factor in the "worsening of Mitchell's pneumonia, hypoxemia, SIRS, sepsis, multiorgan failure and death." *See Patterson v. Ortiz*, 412 S.W.3d 833, 839–40 (Tex. App.—Dallas 2013, no pet.) (if report states the breach of the standard of care by physician or health care provider is the "failure to monitor, observe, test, or evaluate," report must explain what action defendant physician or health care provider would have taken in response to the data obtained from the monitoring, testing, and evaluating that should have been performed; report must explain why action defendant should have taken, either by itself or in coordination with actions of others, would have prevented the patient's injury).

The essence of Grodzin's opinions regarding Ahmed's alleged omissions in failing to diagnose SIRS or sepsis and transfer Mitchell to another health care facility is that Ahmed furnished a condition that made Mitchell's death possible. However, Grodzin's opinion that had Ahmed "made the right decision" in assuring Mitchell's transfer to another hospital, "it is medically probable [Mitchell] would be alive today" because his illness was treatable and reversible, necessitates assumptions and inferences beyond the "four corners" of Grodzin's reports and provides no temporal insight into Ahmed's omissions in the care and treatment of Mitchell rendering Mitchell's conditions untreatable or irreversible. Grodzin's report provides no insight into when transfer of Mitchell to an ICU setting was necessitated in order for Mitchell's conditions to remain treatable or reversible. Grodzin's opinions regarding Ahmed's alleged omissions in Mitchell's care and treatment are speculative and conclusory with respect to causation. *See Kapoor v. Estate of Klovenski*, No. 14-09-00963, 2010 WL 3721866, at *5 (Tex. App.—Houston [14th Dist.] Sept. 23, 2010, no pet.) (mem. op.) (report that failed to connect expert's conclusion regarding delay in diagnosis as cause of death insufficient because it required the court to make inferences regarding what different or more effective treatment was available and that earlier treatment would have been more likely to improve the patient's prognosis); *see also Kocurek v. Colby*, No. 03-13-00057-CV, 2014 WL 4179454, at *5 (Tex. App.—Austin Aug. 22, 2014, no pet.) (mem. op.) (to find expert's report sufficient on causation, court impermissibly would have to make inferences from beyond four corners of the report). We conclude Grodzin's reports fail to provide a fair summary of the causal relationship between Ahmed's purported failures to meet the applicable standards of care and Mitchell's death. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6). Accordingly, the trial court did not abuse its discretion in dismissing appellants' health care liability claims against Ahmed.

Satyu was the attending physician primarily responsible for Mitchell's care after Mitchell was transferred from the Emergency Department to a medical-surgical floor of Renaissance Hospital. In contrast to the insufficiency of Grodzin's opinions of causation with regard to Ahmed's care and treatment of Mitchell, we conclude Grodzin's reports provided a fair summary of the causal relationship between Satyu's purported failures to meet the applicable standards of care and Mitchell's death. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6).

Satyu diagnosed Mitchell with aspiration pneumonia and dehydration; he failed to diagnose Mitchell with SIRS or sepsis. According to Grodzin, Satyu's failure to transfer Mitchell to a "functioning ICU" caused Mitchell's death. Grodzin stated that Satyu's failure to make sure that Mitchell's gastrostomy tube was functional caused continued aspiration into Mitchell's lungs and allowed Mitchell's pneumonia to progress to respiratory failure and death. According to Grodzin:

- Had Satyu provided free water to correct Mitchell's dehydration and hypernatremia, Mitchell's respiratory and pulse rates would have dropped, reducing his risk of cardiac and respiratory failure;

- Had Satyu determined the specific type of pneumonia from which Mitchell was suffering, Mitchell would have received an antibiotic regimen directed at the specific bacterial pneumonia and "preventing sepsis from developing into multi-organ failure and death";

- Had Satyu ordered advanced radiological studies, any increase in "fluid/bacteria" in the lungs would have been apparent, intervention to remove "such fluid/bacteria" would have taken place, preventing sepsis from developing into multi-organ failure and death;

- Had Satyu requested a consultation by a pulmonologist or critical care physician, the consulting physician would have assured enteral access was functional and not causing aspiration into Mitchell's lungs, identified the fungal, viral, and bacterial agent to assure proper antibiotic treatment, and utilized proper doses of intravenous antibiotics, "preventing sepsis from developing into multi-organ failure and death," and provided treatment to stabilize Mitchell's respiratory system;

- Had Satyu provided immediate ventilator support or oxygen therapy to bring Mitchell's oxygen saturation and respiratory rates to normal levels, Mitchell would not have gone into cardiac and respiratory arrest and died;

- Had Satyu provided medication to bring Mitchell's blood pressure to normal levels, Mitchell would not have gone into cardiac and respiratory arrest and died; and

- Had Satyu responded or made clear what other physician should be contacted when the nurse practitioner tried to reach him on September 8, 2012, Mitchell would not have gone two hours without medical intervention rather than being transferred by a nurse to a closed ICU, where Mitchell received no attention from a physician before an emergency Code Blue was called and Mitchell died.

Grodzin opined that each of those "failures kept [Mitchell] from treatment that would have made him better." Grodzin opined that because Satyu did not "follow [those] interventions," Mitchell suffered "declining health, namely the progression from pneumonia dehydration to hypoxemia, hypotension/shock, multisystem organ dysfunction, cerebral anoxia and he died."

"Causation is established by proof that the negligent act or omission was a substantial factor in bringing about the harm and without which the harm would not have occurred." *Costello*, 141 S.W.3d at 249. An expert report "may be sufficient if it states a chain of events that begin with a health care provider's negligence and end in a personal injury." *McKellar*, 367 S.W.3d at 485; *see also Owens v. Handyside*, No. 01-12-01108-CV, 2015 WL 1965830, at *11 (Tex. App.—Houston [1st Dist.] Apr. 23, 2015, no pet. h.). Here, Grodzin explained how Satyu's alleged breaches of applicable standards of care caused Mitchell's deteriorating condition resulting in his death. Of particular note are Grodzin's opinions that had Satyu determined the specific pneumonia from which Mitchell was suffering and ordered an antibiotic regimen directed at specific bacteria, Mitchell's sepsis would not have developed into multi-organ failure and death, and had Satyu provided ventilator support, oxygen therapy, and blood pressure medication, Mitchell would not have gone into cardiac and respiratory arrest and died. In his third report, Grodzin adequately explains the mechanism of the injury in terms of a specific factual causal chain. *See Patterson*, 412 S.W.3d at 839 (concluding report sufficiently "showed that performing the tests and examinations would have led to the diagnosis of pneumonia and [patient's] admission to the hospital, where he would have received 'early,

–17–

aggressive treatment [that], more likely than not, would have saved his life'"). Grodzin does not simply assert Mitchell would have had the possibility of a better outcome if not for Satyu's alleged breaches of the applicable standards of care; instead, Grodzin explained how, during the duration of his care and treatment of Mitchell, Satyu's breaches of the standards of care caused a delay in the diagnosis and treatment of Mitchell's conditions and resulted in his physical deterioration and ultimate death. *See Fagadau v. Wenkstern*, 311 S.W.3d 132, 139 (Tex. App.— Dallas 2010, no pet.) (rejecting contention that expert report was conjectural with respect to causation because there was no indication of the exact date the patient's retinal detachment occurred; although expert's report did not give exact date retinal detachment occurred, expert opined that a sufficient initial examination and re-examination within two weeks would have prevented the retinal detachment, and report linked alleged conduct to patient's injuries); *Gelman v. Cuellar*, 268 S.W.3d, 123, 130 (Tex. App.—Corpus Christi 2008, pet. denied) (expert report adequate regarding breach of standard of care and causation because it explained had patient "been properly monitored and timely treated post-operatively with aggressive respiratory care, she would not have developed respiratory insufficiency," which caused her "anoxic brain damage"); *In re Barker*, 110 S.W.3d 486, 491 (Tex. App.—Amarillo 2003, orig. proceeding) (concluding expert report sufficient because it explained negligent failure to recognize medical condition and delay in treatment increased severity of plaintiff's injuries), *mand. denied*, *In re Woman's Hosp. of Tex., Inc.*, 141 S.W.3d 144 (Tex. 2004).

We conclude Grodzin's reports represent an "objective good faith effort" to inform Satyu of the causal relationship between his alleged failure to adhere to the applicable standards of care and Mitchell's death. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(*l*); *see also Fagadau*, 311 S.W.3d at 139 (expert's report described what ophthalmologist should have done and what happened because he failed to do it; as such, the report "clearly constitute[d] a good faith effort

to provide a fair summary of [the expert's] opinions on causation"). Grodzin's reports inform Satyu of the specific conduct Grodzin has called into question and provide a basis for the trial court to conclude appellants' claims have merit. *See Leland v. Brandal*, 257 S.W.3d 204, 206–07 (Tex. 2008). Accordingly, we conclude the trial court erred to the extent that it granted Satyu's motion to dismiss appellants' claims on the ground that Grodzin's expert reports did not adequately address causation.

We resolve appellants' sole issue against them with regard to the trial court's order dismissing with prejudice their health care liability claims against Ahmed and we resolve appellants' sole issue in their favor with regard to the trial court's order dismissing with prejudice their health care liability claims against Satyu.

## Conclusion

We affirm the trial court's order dismissing with prejudice appellants' health care liability claims against Ahmed. We reverse the trial court's order dismissing with prejudice appellants' health care liability claims against Satyu, and we remand appellants' health care liability claims against Satyu for further proceedings consistent with this opinion.[6]

/Robert M. Fillmore/
ROBERT M. FILLMORE
JUSTICE

140479F.P05

---

[6] Although Ahmed requested attorney's fees in his motion to dismiss filed in the trial court and Ahmed's motion to dismiss was granted, the trial court's order did not award attorney's fees. The record reveals no evidence of Ahmed's attorney's fees at the hearing on Ahmed's motion to dismiss. Further, in his appellate brief, Ahmed did not request a remand for a determination of his attorney's fees. We do not, therefore, remand for consideration of Ahmed's attorney's fees.



# Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

SHARLET O. MITCHELL,
INDIVIDUALLY AND AS
REPRESENTATIVE OF THE ESTATE OF
JOHN MITCHELL AND ALL
BENEFICIARIES AND HEIRS OF JOHN
MITCHELL, DECEASED; DONNA
MITCHELL; AND JOHN MITCHELL, JR.,
Appellants

On Appeal from the County Court at Law
No. 4, Dallas County, Texas,
Trial Court Cause No. CC-13-03855-D.
Opinion delivered by Justice Fillmore,
Justices Stoddart and Whitehill participating.

No. 05-14-00479-CV          V.

NUGGEHALI NEIL SATYU, M.D., AND
ZAHOUR AHMED, M.D., Appellees

In accordance with this Court's opinion of this date, the order of the trial court is **AFFIRMED** in part and **REVERSED** in part. We **AFFIRM** that portion of the trial court's order dismissing appellee Zahour Ahmed, M.D. with prejudice. We **REVERSE** that portion of the trial court's order dismissing appellee Nuggehali Neil Satyu, M.D. with prejudice. We **REMAND** this cause to the trial court for proceedings consistent with this opinion as to appellants' health care liability claims against Nuggehali Neil Satyu, M.D.

It is **ORDERED** that appellee Zahour Ahmed, M.D. recover his costs of this appeal from appellants and that appellants recover their costs of this appeal from appellee Nuggehali Neil Satyu, M.D.

Judgment entered this 17th day of June, 2015.