**Reversed and Remanded; Opinion Filed December 21, 2018.**



In The

# Court of Appeals
## Fifth District of Texas at Dallas

### No. 05-18-00038-CV

**GREENVILLE SNF, LLC D/B/A GREENVILLE HEALTH AND REHABILITATION CENTER, Appellant**
**V.**
**CHARLES WEBSTER, AS REPRESENTATIVE OF THE ESTATE OF FRANCES ROBINSON, DECEASED, Appellee**

**On Appeal from the 196th Judicial District Court**
**Hunt County, Texas**
**Trial Court Cause No. 85194**

## MEMORANDUM OPINION

Before Justices Lang, Fillmore, and Schenck
Opinion by Justice Fillmore

Greenville SNF, LLC d/b/a Greenville Health and Rehabilitation Center (Greenville) filed this interlocutory appeal challenging the trial court's order denying its motion to dismiss healthcare liability claims brought against it by Charles Webster, as representative of the estate of Frances Robinson, Deceased, and overruling its objections to an expert report provided by Webster in support of his health care liability claims. On appeal, Greenville argues the trial court abused its discretion by overruling Greenville's objections and denying its motion to dismiss, because the expert report failed to sufficiently describe how Greenville breached the standard of care and did not adequately link the breach of the standard of care to Robinson's injuries or death. For the reasons that follow, we conclude the expert report did not satisfy the statutory requirements of

chapter 74 of the Texas Civil Practice and Remedies Code because it is deficient with regard to the statutory element of causation, and the trial court abused its discretion by overruling Greenville's objections to the expert report. We reverse the trial court's order overruling Greenville's objections to the expert report and remand the case to the trial court to consider granting a thirty-day extension of time to allow Webster to attempt to cure the deficiency in Dr. Rushing's expert report regarding the statutory element of causation.

## Background

### *Factual Allegations*

Robinson was a resident at Greenville. Webster, as representative of Robinson's estate, filed this lawsuit against Greenville following Robinson's death. The petition asserted that on December 6, 2015, a Greenville employee discovered Robinson in a non-responsive state with a significantly diminished oxygen saturation level of seventy-two percent, but waited forty-five minutes before contacting 911 to transfer Robinson to a hospital for emergency care. At Hunt Regional Medical Center, an MRI revealed that Robinson had sustained acute brain infracts, which allegedly resulted in irreversible damage. Robinson was discharged for palliative care and died on January 17, 2016.

The petition alleged Greenville was negligent and grossly negligent in fulfilling its responsibilities in accordance with acceptable standards of medical practice by failing to timely call 911 when a Greenville employee found Robinson non-responsive with a diminished oxygen saturation level, and by failing to properly train and supervise its employees. The petition alleged that Greenville's negligence and gross negligence directly and proximately caused Robinson's "injuries and damages," and sought damages for past medical expenses, funeral and burial expenses, loss of earnings, physical pain and suffering in the past, mental anguish in the past, costs of court, and exemplary damages.

*Procedural History*

Webster filed the petition on September 14, 2017. Because this lawsuit involved a health care liability claim, it was subject to the requirements of chapter 74 of the Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 74.001–.507. In accordance with chapter 74, Webster served on Greenville an expert report and curriculum vitae of Dr. Lige B. Rushing, Jr.[1] On November 9, 2017, Greenville filed objections to Webster's chapter 74 expert report, and a motion to dismiss and motion for attorney's fees, for failure to file an adequate expert report. By order dated December 27, 2017, the trial court overruled Greenville's objections and denied its motion to dismiss and motion for attorney's fees. Greenville filed notice of interlocutory appeal on January 11, 2018.

**Applicable Law**

Chapter 74 of the civil practice and remedies code requires a claimant pursuing a health care liability claim to serve one or more expert reports on each physician or health care provider against whom a health care liability claim is asserted no later than 120 days after the date each defendant's original answer is filed. *Id.* § 74.351(a). A report meets the requirements of chapter 74 if it represents "an objective good faith effort to comply with the definition of an expert report." *Id.* § 74.351(l). "Expert report" is defined as:

> [A] written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

*Id.* § 74.351(r)(6).

---

[1] The clerk's record reflects that Dr. Rushing's expert report and curriculum vitae were filed with the trial court on the same date the petition was filed. Greenville's objections to Webster's chapter 74 expert report, motion to dismiss and motion for attorney's fees states Greenville was served with Dr. Rushing's expert report and curriculum vitae on or about October 20, 2017.

The trial court may grant a motion challenging the adequacy of an expert report under the provisions of chapter 74 only if the report does not represent an objective good faith effort to comply with section 74.351(r)(6) by informing the defendant of the specific conduct that is the subject of the plaintiff's claim, and providing a basis for the trial court to conclude the plaintiff's claim has merit. *Id.* at § 74.351(l); *Hebner v. Reddy*, 498 S.W.3d 37, 41 (Tex. 2016); *Loaisiga v. Cerda*, 379 S.W.3d 248, 260 (Tex. 2012). The expert report need not marshal all of the plaintiff's proof, *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001), but it must include a fair summary of the expert's opinion as of the date of the report on each of the three elements required by chapter 74: the applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6); *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (per curiam).

In determining whether the expert report represents an objective good faith effort to comply with the statutory requirements, the court's inquiry is limited to the four corners of the report. *Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010). The report cannot merely state the expert's conclusions but must explain the basis of his statements and link his conclusions to the facts. *Id.* The purpose of the expert report requirement is to "deter baseless claims, not to block earnest ones." *Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 631 (Tex. 2013); *see also Scoresby v. Santillan*, 346 S.W.3d 546, 554 (Tex. 2011); *Nexion Health at Garland, Inc. v. Townsend*, No. 05-15-00153-CV, 2015 WL 3646773, at *3 (Tex. App.—Dallas June 12, 2015, pet. denied) (mem. op.). Thus, the expert report must link its conclusions to the facts, but no "magical words" are required. *Bowie Mem. Hosp.*, 79 S.W.3d at 53. Because the expert report requirement "is a threshold mechanism to dispose of claims lacking merit," *Potts*, 392 S.W.3d at 631, it may be

informal and the information presented need not meet the same requirements as evidence offered in summary judgment proceedings or in a trial. *Godat v. Springs*, No. 05-08-00791-CV, 2009 WL 2385569, at *3 (Tex. App.—Dallas Aug. 5, 2009, no pet.) (mem. op.). "Further, the report is not required to address every alleged liability theory to make the defendant aware of the conduct at issue." *Nexion Health at Garland*, 2015 WL 3646773, at *3. "If a health care liability claim contains at least one viable liability theory, as evidenced by an expert report meeting the statutory requirements, the claim cannot be frivolous." *Id.* (quoting *Potts*, 392 S.W.3d at 631).

To establish a causal relationship between the injury and the defendant's negligent act or omission, the expert report must show the defendant's conduct was a substantial factor in bringing about the harm, and, absent this act or omission, the harm would not have occurred. *Mitchell v. Satyu*, No. 05-14-00479-CV, 2015 WL 3765771, at *4 (Tex. App.—Dallas June 17, 2015, no pet.) (mem. op.). Causation is generally established through evidence of a "reasonable medical probability" that the injury was caused by the negligence of one or more of the defendants, meaning that it is more likely than not that the ultimate harm or condition resulted from such negligence. *See Jelinek*, 328 S.W.3d at 532–33. We may not "fill gaps" in an expert report by drawing inferences or guessing what the expert likely meant or intended. *Patterson v. Ortiz*, 412 S.W.3d 833, 835–36 (Tex. App.—Dallas 2013, no pet.). An expert's conclusion that in reasonable medical probability one event caused another, without explanation and without linking conclusions to the facts, differs little from an *ipse dixit*, which the supreme court has consistently criticized. *Jelinek.* 328 S.W.3d at 539. "[T]he expert must go further and explain, to a reasonable degree, how and why the breach caused the injury based on the facts presented." *Id.* at 539–40. "An expert may show causation by explaining a chain of events that begins with [the defendant's] negligence and ends in injury to the plaintiff." *Mitchell*, 2015 WL 3765771, at *4. "We determine

whether a causation opinion is sufficient by considering it in the context of the entire report." *Id.*
(quoting *Ortiz v. Patterson*, 378 S.W.3d 667, 671 (Tex. App.—Dallas 2012, no pet.)).

## Standard of Review

We review a trial court's ruling on the sufficiency of an expert's report for abuse of discretion. *Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 142 (Tex. 2015); *Nexion Health at Terrell Manor v. Taylor*, 294 S.W.3d 787, 791 (Tex. App.—Dallas 2009, no pet.). A trial court abuses its discretion if it acts arbitrarily, unreasonably, or without reference to any guiding rules or principles. *Jelinek*, 328 S.W.3 at 539. The trial court has no discretion in determining what the law is or applying the law to the facts. *Sanchez v. Martin*, 378 S.W.3d 581, 587 (Tex. App.—Dallas 2012, no pet.). A clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion. *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992) (orig. proceeding).

## The Expert Report

In two issues, Greenville contends the trial court abused its discretion by: (1) overruling its objections to Dr. Rushing's expert report because the report failed to sufficiently describe how Greenville purportedly breached the standard of care and was conclusory as to causation because it did not adequately link the alleged breach in the standard of care to Robinson's injuries and death, and (2) and denying its motion to dismiss Webster's claims.

In his expert report, Dr. Rushing provided his qualifications and identified the records he reviewed in forming his conclusions. Dr. Rushing stated the opinions expressed in the expert report were based on his review of the pertinent medical records; reasonable medical probability; his education, training, and experience; and his knowledge of the accepted medical and nursing standards of care for diagnoses, care, and treatment of the relevant illnesses, injuries, and conditions. In his expert report, Dr. Rushing purported to: compare Greenville's care and

treatment of Robinson's illnesses, injuries, and conditions, as revealed in the records, to the accepted standards of care in order to determine whether Greenville's conduct met or fell below those standards of care; and evaluate whether breaches in the standards of care resulted in in any injury to Robinson. Dr. Rushing stated, "[t]his is the method employed by every physician who is asked to evaluate the quality of another professional caregiver's care and treatment of a patient, whether in the context of a lawsuit or a hospital's or a nursing home's Peer Review setting. In other words, this method is the generally accepted method for evaluating whether or not a hospital and/or a physician's care and treatment of a patient met or fell below the accepted standards of care."

Dr. Rushing provided his understanding of the underlying facts based on the records he reviewed. The expert report stated Robinson had a history of "hypothyroidism chronic leg swelling, recurrent infection of both legs," "ventral hernia," and "cirrhosis of the liver"; and also had a "partial small bowel obstruction" and was "anticoagulated with Coumadin because of pulmonary embolism." According to Dr. Rushing, Robinson was admitted to the Hunt Regional Medical Center on October 10, 2015, and discharged on November 13, 2015, when she was admitted to Greenville. She was discharged from Greenville on December 6, 2015, following Greenville's call for 911 medical response. Dr. Rushing provided a summary of a "nurses progress note" dated December 5, 2015:

> In the [Greenville] nurses progress note . . . dated 12/6/15 and timed at 0335 hours there's an entry "send to ER HR MC.["] There are three choices i.e. boxes to be checked. 1. Transfer to the hospital (nonemergency) (send a copy of this form). 2. Call for 911. 3. Emergency medical transport. The number one choice box is checked. The narrative nurse note reads as follows "resident unresponsive to verbal stimuli during rounds, O2 sat 72% at 0250 hours with nail bed cyanotic. DON notified at 0307 instructed to send out, M.D. was called with no answer unable to leave message, nephew Charles called but no answer message left.["] There is an illegible signature followed by the suffix LVN. The date is 12/6/15. Time (AM/PM) there are two time entries the first 0329 – left message the second is simply 0730.

Dr. Rushing continued,

> I have reviewed the DARS investigative report. This report reflects that [Robinson] indeed did have a pulse oxygen saturation level of 72%, cyanotic nail beds, and was unresponsive to verbal stimuli. Her vital signs were: blood pressure 107/84, 122 [sic] and respiratory rate 24. The record reflects that the family member was called but no answer at 3:29 [a.m.] and at 7:30 a.m. and that the doctor was called at 3:35 [a.m.]. The DARS record reflects that the nurse waited 45 minutes before calling 911 when Ms. Robinson experienced a change of condition characterized by an oxygen saturation of 72%, cyanosis of hands and unresponsiveness.

The expert reported noted, "the sequential causes of death on her death certificate are urinary tract infection, cerebrovascular accident, bowel obstruction due to ventral hernia, congestive heart failure."

With respect to the applicable standard of care Greenville owed to Robinson, the expert report stated, "In this case the standard of care required that Frances Robinson be transferred immediately by calling 911 when she was initially discovered to be unresponsive and to have an oxygen saturation of 72%. In a case like this there should be no delay in transferring Ms. Robinson to the hospital just in order to notify the attending physician, the DON or family" who should be notified "only after calling 911 for emergent transportation to the hospital. There was a delay of approximately 45 minutes from the time Robinson was found unresponsive cyanotic and with an oxygen saturation of 72% before 911 was called." The expert report concluded,

> [T]he standard of care was breached when the nurse caring for M[s.] Robinson failed to transfer her immediately via 911 ambulance when she was discovered to be unresponsive, cyanotic, and to have an oxygen saturation of 72%.

> The harm/injury that resulted from the breach of the standard of care as described in the preceding paragraph, more likely than not, based on reasonable medical probability was that due to her low oxygen saturation she developed multiple brain infarcts which proximately caused M[s.] Robinson's death.

> . . . .

> If M[s.] Robinson's critical clinical status i.e. her oxygen desaturation and cyanosis and her unresponsiveness had been recognized, understood and

properly assessed and acted on by immediately transferring M[s.] Robinson to the hospital then more likely than not the multiple ischemic infarcts i.e. anoxic injury to the brain would not have occurred.

## Analysis

On appeal, Greenville does not contend the expert report did not address the applicable standard of care. Rather, in its first issue, Greenville argues Dr. Rushing did not adequately describe how Greenville breached the standard of care. Greenville further avers Dr. Rushing's expert report was conclusory as to causation, and did not sufficiently link Greenville's purported breach of the applicable standard of care to Robinson's injuries and/or death. Specifically with respect to causation, Greenville contends Dr. Rushing's expert report failed to:

• explain "how a delay in transferring [Robinson] via an ambulance to the hospital for emergency medical attention caused multiple ischemic brain infarcts, which could have pre-existed and caused the emergency situation";

• explain "how Greenville's alleged breach of the standard of care caused [Robinson] any injury, much less caused her death, one month later";

• explain "how he ruled out other probable causes of [Robinson's] injuries and/or death"; and

• establish "that Greenville's alleged negligence was the cause in fact of [Robinson's] low oxygen saturation level and multiple ischemic brain infarcts, rather than one of her multiple existing comorbidities."

In response, Webster claims Dr. Rushing's expert report adequately explained how Greenville's delay in calling 911 breached the applicable standard of care and caused Robinson's death "due to infarct." Webster also responds that Greenville waived its right to object to Dr. Rushing's expert report by issuing and responding to discovery. Webster's argument Greenville waived its right to move to dismiss Webster's claims by participating in discovery is without merit. "Attempting to learn more about the case through discovery does not demonstrate an intent to waive the right to dismiss[.]" *Seifert v. Price*, No. 05-08-00655-CV, 2008 WL 5341045, at *2 (Tex. App.—Dallas Dec. 23, 2008, pet. denied) (mem. op.); *see also Iasis Healthcare Corp. v. Pean*, No. 01-17-00638-CV, 2018 WL 3059789, at *6 (Tex. App.—Houston [1st Dist.] June 21,

–9–

2018, no pet.).

Greenville's complaint that the expert report failed to describe how Greenville breached the standard of care lacks merit. The expert report stated the applicable standard of care required Greenville and its staff to recognize Robinson's critical clinical status and immediately call 911 for timely transport to the hospital. Dr. Rushing opined,

> In a case like this there should be no delay in transferring Ms. Robinson to the hospital just in order to notify the attending physician, the DON or family.
>
> . . . .
>
> In this case the standard of care was breached when the nurse caring for [Ms.] Robinson failed to transfer her immediately via 911 ambulance when she was discovered to be unresponsive, cyanotic, and to have an oxygen saturation of 72%.

We conclude the expert report sufficiently described how Greenville breached the applicable standard of care by providing "specific information about what [Greenville] should have done differently." *Palacios*, 46 S.W.3d at 880.

While Dr. Rushing's expert report provided a fair summary of the bases of his opinions concerning the standard of care and the manner in which Greenville failed to meet the standard of care, his report failed to provide a fair summary of the basis of his opinion on the statutory element of causation. With respect to causation, Dr. Rushing merely opined in a conclusory manner that, based on reasonable medical probability, as a result of Greenville's forty-five minute delay in calling 911 after discovering Robinson unresponsive and with an oxygen saturation level of seventy-two percent, Robinson more likely than not developed multiple brain infarcts which proximately caused her death. Given Robinson's complicated medical condition,[2] Dr. Rushing failed to explain how an oxygen saturation level of seventy-two percent could cause brain infarcts, how brain infarcts could have proximately caused Robinson's death, how or why a forty-five

---

[2] Dr. Rushing indicated in his expert report that "[t]he sequential causes of death on [Robinson's] death certificate are urinary tract infection, cerebrovascular accident, bowel obstruction due to ventral hernia, [and] congestive heart failure."

minute delay in calling for 911 medical response resulted in brain infarcts, or what medical treatment could have been provided to prevent Robinson's brain infarcts and ultimate death had emergency medical care been summoned immediately. *See Covey v. Lucero*, No. 05-16-00164-CV, 2016 WL 7163835, at *6 (Tex. App.—Dallas Nov. 17, 2016, no pet.) (mem. op.) (expert opinion that negligent acts and omissions were "major contributing factors" to patient's death, without explaining the link between the breach in standards of care and subsequent consequences, presents only speculative and conclusory possibility of causation). In short, Dr. Rushing failed to explain how and why Greenville's forty-five minute delay in calling for 911 medical response was the proximate cause of Robinson's death. We may not "fill gaps" in Dr. Rushing's expert report by drawing inferences or guessing what he likely meant or intended. *Patterson*, 412 S.W.3d at 835–36.

Webster points to the Texas Supreme Court's recent opinion in *Abshire v. Christus Health Southeast Texas*, No. 17-0386, 2018 WL 6005220 (Tex. Nov. 16, 2018) (per curiam), in support of his argument that Dr. Rushing's expert report satisfied the statutory element of causation. In that case, Abshire visited the emergency room of Christus Hospital five times in a two-week period for chest pain, shortness of breath, and back pain. *Id.* at *1. Abshire was released by Christus Hospital and transferred to HealthSouth Rehabilitation Hospital, where she was treated for two days and then sent back to Christus Hospital for further evaluation. Christus Hospital attempted to transfer Abshire back to HealthSouth Rehabilitation Hospital, but a rehabilitation physician intervened and transferred Abshire to another hospital, Baptist Beaumont. Baptist Beaumont physicians ordered an MRI that revealed Abshire had suffered a spinal compression fracture of her T-5 vertebrae that ultimately rendered her a paraplegic and incontinent. *Id.* at *2. In her lawsuit against Christus Hospital, Abshire alleged that nurses failed to recognize and document her longstanding osteogenesis imperfect (OI), commonly referred to as brittle bone disease, that

–11–

predisposed her to fractures, and failed to recognize the signs and symptoms of a spinal compression fracture, which caused a delay in treatment. *Id.* at *1–3. In support of her allegations, Abshire served an expert report and a supplemental expert report prepared by Dr. Rushing. The hospital objected to and moved to dismiss Dr. Rushing's expert report on several grounds, including that the expert report did not sufficiently establish the causal link between its conduct and Abshire's injuries. The trial court agreed with the hospital's objections and granted Abshire a thirty-day extension to address the report's deficiencies. Abshire filed a supplemental expert report from Dr. Rushing and an additional expert report from a registered nurse. *Id.* at *2. The trial court concluded Dr. Rushing's supplemental expert report satisfied chapter 74's requirements. *Id.*

The court of appeals reversed and dismissed Abshire's claims against the hospital, concluding there was an "analytical gap" in Dr. Rushing's opinion that the nurses' failure to chart Abshire's history of OI caused Abshire's injury, because Dr. Rushing did not "explain how the nurses' alleged failure to document OI was a substantial factor in causing or exacerbating Abshire's injuries, or that had such been known then the physicians would have changed the course of treatment, or that it would have changed the outcome." *HealthSouth Rehab. Hosp. of Beaumont, LLC v. Abshire*, No. 09-16-00107-CV, 2017 WL 1181380, at *18 (Tex. App.—Beaumont Mar. 30, 2017) (mem. op.), *rev'd*, *Abshire*, No. 17-0386, 2018 WL 6005220. Consequently, the court of appeals concluded Dr. Rushing's supplemental report was deficient. *Id.*

The supreme court reversed the court of appeals' judgment, *Abshire*, 2018 WL 6005220, at *1, concluding Dr. Rushing's supplemental report "explained how the nurses' breach—failing to consistently document Abshire's OI, particularly in light of her continued complaints of back pain—caused a delay in diagnosis and proper treatment and why that delay caused the issues that led to Abshire's paraplegia." *Id.* at *5. The supreme court explained, "the report draws a line

–12–

directly from the nurses' failure to properly document Abshire's OI and back pain, to a delay in diagnosis and proper treatment (imaging of her back and spinal fusion), to the ultimate injury (paraplegia)." *Id.* The supreme court concluded, "[t]hus, the report adequately explained the links in the causal chain." *Id.*

Webster contends that, as in *Abshire*, Dr. Rushing's expert report adequately explained how the nurse's failure to immediately call 911 caused Robinson's injury. However, unlike in *Abshire*, Dr. Rushing's expert report in this case did not draw a line directly from the forty-five minute delay in summoning emergency care to the cause of Robinson's death, about one month after Greenville last provided care, from multiple brain infarcts. In this case, the expert report did not describe the "proper treatment" that an immediate call to 911 would have permitted that would have changed the outcome with regard to the cause of Robinson's death. *See id.*

Greenville also complains that Dr. Rushing's expert report failed to: (1) "rul[e] out other probable causes" of Robinson's death, and (2) establish that Greenville's actions and not "one of [Robinson's] multiple existing comorbidities" caused her low oxygen saturation level and multiple ischemic brain infarcts. However, these complaints are without merit because "[n]othing in section 74.351 suggests the preliminary report is required to rule out every possible cause of the injury, harm, or damages claimed, especially given that section 74.351(s) limits discovery before a medical expert's report is filed." *Jones v. Ashford Hall*, No. 05-16-01402-CV, 2018 WL 2315960, at *10 (Tex. App.—Dallas May 22, 2018, pet. denied) (mem. op.) (internal citations omitted) (chapter 74 expert report sufficiently described causation although it did not rule out "old age" as cause of decedent's death when death certificate listed cause of death as "advanced age years").

Because Dr. Rushing's expert report did not satisfy the statutory element of causation by setting out a fair summary of the basis of his opinion as to the causal relationship between the purported breach of the standard of care and Robinson's injuries and death, the report is deficient

under chapter 74.  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6).  Accordingly, we conclude the trial court abused its discretion in concluding Dr. Rushing's expert report sufficiently addressed the statutory element of causation and overruling Greenville's objections to the expert report.  We resolve Greenville's first issue in its favor insofar as it relates to the deficiency in Dr. Rushing's expert report regarding the statutory element of causation.

## Remand for Opportunity to Cure

Chapter 74 provides that if the elements of an expert report are found deficient, the court may grant one thirty-day extension of time to the claimant to cure the deficiency, unless it is objectively shown that the report was not filed in good faith, at which point, dismissal is required. *Id.* § 74.351(c); *Gonzalez v. Padilla*, 485 S.W.3d 236, 242 (Tex. App.—El Paso 2016, no pet.). "The purpose of the expert report requirement is to deter frivolous claims, not to dispose of claims regardless of their merits." *Scoresby*, 346 S.W.3d at 554.  That purpose is served by allowing a claimant to cure deficiencies to the extent allowed by the Legislature.  *Id.* at 556 ("An inadequate expert report does not indicate a frivolous claim if the report's deficiencies are readily curable."). Trial courts "should be lenient in granting thirty-day extensions and must do so if deficiencies in an expert report can be cured within the thirty-day period." *Id.* at 554.  This Court may remand for consideration of an extension under section 74.341(c) if we find deficient an expert report the trial court considered adequate.  *See Leland v. Brandal*, 257 S.W.3d 204, 207 (Tex. 2008); *Tenet Hosps., Ltd. v. De La Riva*, 351 S.W.3d 398, 407–08 (Tex. App.—El Paso 2011, no pet.) (upon finding trial court abused its discretion in denying defendant physician's motion to dismiss, proper course of action was to remand the cause to trial court to consider whether the deficiencies could be cured).

In response to Greenville's objections to Dr. Rushing's expert report and motion to dismiss, Webster asserted Dr. Rushing's report satisfied the requirements of chapter 74 but requested that

if the report was found to be deficient, the trial court grant a thirty-day extension of time under section 74.351(c) of the civil practice and remedies code to cure any deficiency. We have concluded Dr. Rushing's expert report was deficient because it did not contain a fair summary of the basis of his opinion concerning the statutory element of causation. Because Webster has not been given an opportunity to cure the deficiency regarding causation in Dr. Rushing's report, and because Dr. Rushing's report is not so deficient as to constitute no report at all, *see Scoresby*, 346 S.W.3d at 551, 556, we remand for the trial court to consider granting a thirty-day extension of time to allow Webster to attempt to cure the deficiency in the expert report regarding the statutory element of causation.[3]

### Conclusion

We conclude the trial court abused its discretion in overruling Greenville's objection to Dr. Rushing's expert report on the issue of causation. We remand the case to the trial court to consider granting a thirty-day extension of time to allow Webster to attempt to cure the deficiency in Dr. Rushing's expert report regarding the statutory element of causation.

/Robert M. Fillmore/
ROBERT M. FILLMORE
JUSTICE

180038F.P05

---

[3] Based upon our resolution of Greenville's first issue and our remand of the case to the trial court to consider whether to grant a thirty-day extension of time to allow Webster to attempt to cure the deficiency in the expert report, we need not address Greenville's second issue in which it asserts the trial court abused its discretion by denying its motion to dismiss Webster's healthcare liability claims against it. TEX. R. APP. P. 47.1.



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

GREENVILLE SNF, LLC D/B/A
GREENVILLE HEALTH AND
REHABILITATION CENTER, Appellant

No. 05-18-00038-CV     V.

CHARLES WEBSTER, AS
REPRESENTATIVE OF THE ESTATE
OF FRANCES ROBINSON, DECEASED,
Appellee

On Appeal from the 196th Judicial District
Court, Hunt County, Texas,
Trial Court Cause No. 85194.
Opinion delivered by Justice Fillmore,
Justices Lang and Schenck participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **REVERSED** and this cause is **REMANDED** to the trial court for proceedings consistent with this opinion.

It is **ORDERED** that appellant Greenville SNF, LLC d/b/a Greenville Health and Rehabilitation Center recover its costs of this appeal from appellee Charles Webster, as Representative of the Estate of Frances Robinson, Deceased.

Judgment entered this 21st day of December, 2018.