NEXION HEALTH AT TERRELL MANOR d/b/a Terrell Manor, Inc. and Brenda J. Allen, R.N., Appellants

v.

Chad TAYLOR, Individually and on Behalf of the Estate of Stephen Taylor, Deceased, Appellee.

No. 05–09–00019–CV.

Court of Appeals of Texas, Dallas.

Aug. 21, 2009.

Bryan Rutherford, MacDonald Devin, PC, Dallas, TX, for Appellant.

Patrick Short, Law Firm of Patrick Short, Rockwall, TX, for Appellee.

Before Justices FITZGERALD, LANG, and FILLMORE.

## OPINION

Opinion By Justice FILLMORE.

Nexion Health at Terrell Manor d/b/a Terrell Manor, Inc. and Brenda J. Allen, R.N. bring this interlocutory appeal of the trial court's order denying their motion to dismiss this medical malpractice case brought by Chad Taylor, Individually and on Behalf of the Estate of Stephen Taylor, Deceased. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(9) (Vernon 2008). In their sole issue on appeal, appellants assert the trial court abused its discretion in denying their motion to dismiss because appellee failed to serve an adequate expert report. We affirm the trial court's order.

## BACKGROUND

In 2005, Stephen Taylor (Taylor) was a resident of Terrell Manor nursing home, located in Terrell, Texas. On December 5, 2005, Taylor was admitted to the Terrell Medical Center with pneumonia, and he died there on December 20, at the age of fifty-seven. On December 10, 2007, appellee sued the nursing home, as well as two doctors and two nurses who practiced there, alleging their negligent care of Taylor resulted in his death. Appellee also alleged that the nursing home's negligent failure to provide adequate training and guidelines to its staff led to Taylor's death.

On April 8, 2008, appellee served appellants with an expert report prepared by Dr. David Seignious, M.D. Appellants moved to dismiss the case, arguing the expert report was inadequate. The trial court found the report was inadequate but granted appellee a thirty-day extension to serve appellants with an adequate expert report by Dr. Seignious. After appellee timely served Dr. Seignious's amended expert report, appellants filed another motion to dismiss, arguing that the amended report was inadequate. After a hearing, the trial court denied the motion to dismiss, and appellants filed their notice of appeal.

## STANDARD OF REVIEW AND APPLICABLE LAW

Chapter 74 of the Texas Civil Practice & Remedies Code requires a plaintiff bringing a health care liability claim to serve the defendants with an expert report not later than the 120th day after the date the original petition was filed. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(a) (Vernon Supp. 2008). If the plaintiff fails to timely serve the expert report, the trial court, on the motion of the defendant, must dismiss the claim and award the defendant reasonable attorney's fees and costs of court. *Id.* § 74.351(b). If a motion to dismiss is filed and the court determines that an expert report is deficient, the court may grant one 30–day extension to the plaintiff to cure the deficiency. *Id.* § 74.351(c). The statute defines "expert report" as follows:

> "Expert report" means a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding [1] applicable standards of care, [2] the manner in which the care rendered by the physician or health care provider failed to meet the standards, and [3] the causal relationship between that failure and the injury, harm, or damages claimed.

*Id.* § 74.351(r)(6) (bracketed numbering added). The court must grant a motion

challenging the adequacy of the expert report only if the court determines "that the report does not represent an objective good faith effort to comply with the definition of an expert report." *Id.* § 74.351(*l*).

Appellate courts review the trial court's determination of the adequacy of an expert report for an abuse of discretion. *Jernigan v. Langley,* 195 S.W.3d 91, 93 (Tex.2006) (per curiam) (discussing former article 4590i); *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 875 (Tex.2001) (discussing former article 4590i); *Baylor Med. Ctr. v. Wallace,* 278 S.W.3d 552, 555 (Tex.App.-Dallas 2009, no pet.). A trial court abuses its discretion by acting in an arbitrary or unreasonable manner without reference to guiding rules or principles. *Walker v. Gutierrez,* 111 S.W.3d 56, 62 (Tex.2003); *Wallace,* 278 S.W.3d at 555. When reviewing matters committed to the trial court's discretion, an appellate court may not substitute its judgment for that of the trial court. *Walker,* 111 S.W.3d at 62; *Baylor Univ. Med. Ctr. v. Rosa,* 240 S.W.3d 565, 569–70 (Tex.App.-Dallas 2007, pet. denied). A trial court does not abuse its discretion merely because it decides a discretionary matter differently than an appellate court would under similar circumstances. *Rosa,* 240 S.W.3d at 569. However, a trial court has no discretion in determining what the law is or in applying the law to the facts. *In re Jorden,* 249 S.W.3d 416, 424 (Tex. 2008) (orig. proceeding); *Rosa,* 240 S.W.3d at 569. A clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion. *Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992) (orig. proceeding); *Rosa,* 240 S.W.3d at 569.

An expert report under section 74.351(r)(6) of the Texas Civil Practice and Remedies Code must provide enough information to fulfill two purposes if it is to constitute an objective, good-faith effort. The report must inform the defendant of the specific conduct the plaintiff has called into question, and the report must provide a basis for the trial judge to conclude the claims have merit. *See Palacios,* 46 S.W.3d at 879; *Rosa,* 240 S.W.3d at 569.

Whether the report complies with the requirements of section 74.351(r)(6) is determined by examining only the report itself. *Bowie Mem. Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002); *Palacios,* 46 S.W.3d at 878. The report need not marshal all the plaintiff's proof, but it must include a fair summary of the expert's opinions on each of the three elements required by the statute: the applicable standards of care, the manner in which the care rendered failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6); *Wright,* 79 S.W.3d at 52; *Palacios,* 46 S.W.3d at 878. The report cannot merely state the expert's conclusions about these elements. *Wright,* 79 S.W.3d at 52; *Palacios,* 46 S.W.3d at 879. "[R]ather, the expert must explain the basis of his statements to link his conclusions to the facts." *Wright,* 79 S.W.3d at 52 (quoting *Earle v. Ratliff,* 998 S.W.2d 882, 890 (Tex.1999)). However,

> [a] plaintiff need not present evidence in the report as if he were actually litigating the merits. The report can be informal in that the information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial.

*Palacios,* 46 S.W.3d at 879. Furthermore, "because the statute focuses on what the report discusses, the only information relevant to the [appellate] inquiry is within the four corners of the document." *Id.* at 878.

In this case, appellants assert Dr. Seignious's amended report did not adequately

meet the third element of the statutory definition of an expert report, "the causal relationship between that failure [to meet the applicable standards of care] and the injury, harm, or damages claimed." We therefore examine the report to determine whether it satisfies the required statutory element of causation.

## THE EXPERT REPORT

In the amended expert report, Dr. Seignious set out his qualifications, which are not challenged, and the evidence he reviewed in forming his conclusions, which consisted of appellee's original petition and the medical records from the nursing home, where he resided through December 4, 2005, and Terrell Medical Center, where he was hospitalized from December 5, 2005 until he died on December 20, 2005.

Dr. Seignious's report stated the records showed that Taylor "had a history of Schizophrenia NEC; Uncomplicated Vascular Dementia; Hyperthyroidism; Convulsions; Diabetes Mellitus, SYN; Chronic Airway Obstruction and Hypertension." The report then observed that on November 6, 2005, Taylor had a cough and a cold and was diagnosed with bronchitis. The next day, Taylor requested cough medicine and was given 10cc of Tussin DM. On November 18, Taylor still had a harsh cough. A nurse again diagnosed bronchitis, "and to rule out pneumonia," she ordered an X-ray "STAT." For the rest of November, the nurses' notes record Taylor continuing to have a cough and a temperature varying between 97.2 and 99 degrees. On November 30, Taylor refused to eat breakfast. A nurse ordered an X-ray, and the nurses' notes observed he had a cough and was in mild distress. The notes also contain the diagnosis of pneumonia. A nurse ordered a daily dose of 750 mg of Levaquin. That evening, Taylor asked to see the nurse and complained that he was

still sick. The next day, December 1, Taylor's cough continued, and he refused to eat supper. On December 4, the nurses' notes stated Taylor continued to receive Levaquin for pneumonia, had a temperature of 102.2, had decreased energy and endurance, refused to eat supper, "refused supplement," and had poor fluid intake. The next day, Taylor was taken to Terrell Medical Center in an ambulance. According to the report, "[u]pon arriving at the hospital his oxygen saturation level was 88 and his condition continued over several hours to decline. Terrell Hospital diagnosed Mr. Taylor with pneumonia and his respiratory status was diminished on the right and left." The assessment of Taylor in the emergency room was acute respiratory failure requiring emergent intubation, septic shock, and disseminated intravascular coagulation and bibasilar aspiration pneumonia, "among other things." Taylor was taken to the intensive care unit, where "he was intubated for respiratory failure and exhaustion and his condition was guarded."

The report stated further,

Mr. Taylor's medical and health condition was deteriorated to a point beyond treatment and reversal and given his prior health complications, proved to be too much to recover from and he subsequently died. Given proper treatment, Mr. Taylor suffered from a treatable condition; however, without proper treatment, such condition can lead to further complications and death, which was the end result for Mr. Taylor in this case.

If the proper treatment would have been rendered by the Nurses in question, and Dr. Satyu, then there was the possibility of a better outcome for Mr. Taylor. In this case, Mr. Taylor was not given that chance. The nurses in question and Dr. Satyu failed to order

the necessary testing, x-rays, follow-up x-rays, oxygenation monitoring, and a proper course of antibiotic therapy, among others, [sic] then Mr. Taylor could have been afforded a better chance of recovery. He was not given that chance by the nurses in question and Dr. Satyu. Because of their negligence, he was allowed to deteriorate to the point that treatment could not reverse the complications from lack of treatment and he died as a result.

The report listed the nurses' deviations from the applicable standards of care, including:

- failing to diagnose Taylor as a high risk, especially for respiratory problems, due to his pre-existing illnesses;

- failing to evaluate Taylor's condition properly and to recognize his clinical course deviated from the expected norm;

- failing to monitor and re-evaluate Taylor's condition appropriately;

- failing to recognize Taylor's inappropriate response to antibiotic therapy and to intervene appropriately;

- failing to order X-rays and follow-up X-rays and failing to monitor Taylor's oxygen-saturation level to determine the status of his lungs and whether the antibiotic treatment was working;

- delaying transporting Taylor to the hospital until his condition reached grave levels;

- failing to keep the physician in charge informed of Taylor's deteriorating condition, and if the physician refused or failed to provide appropriate treatment, then the nurses were obligated to follow the nursing home's chain-of-command policy; and

- failing to consult with the physician in a timely manner.

In discussing the last deviation by the nursing staff, the report stated,

In addition to their independent responsibility for patient care, the nurses were obligated to evaluate Mr. Taylor appropriately and present the collected data to Dr. Satyu via the telephone. Nurses serve as patient advocates on behalf of patients in their interactions with hospitals, nursing homes and physicians. If they felt Dr. Satyu['s] response to their concerns over the telephone was inadequate, the nurses are obligated to insist upon the doctor coming to the nursing home facility and evaluating their patient themselves. If the doctor refuses, the nurses are obligated to institute the nursing home's chain of command policy, appealing to the charge nurse, then nursing supervisors, or other doctors in charge if necessary. Even without appropriate physician response or care, the nurses had an independent responsibility to Mr. Taylor to ensure he was cared for within the standard of care, and specifically, not ignored and not adequately treated for his medical condition without completely eliminating the possibility of pneumonia, respiratory distress, septic shock, among other conditions. *If these standards had been followed, the death of Mr. Taylor would not have occurred.*

(Emphasis added.) At the conclusion of the section discussing the nursing staff, the report stated,

All of these failures in combination, lead [sic] to the demise of Mr. Taylor. If M.A. Stewart, RN, FNP and B. Allen, LVN or other personnel at Terrell Manor had not deviated from the standards of care as outlined above, it is within reasonable medical probability that the medical problems and subsequent death of Mr. Taylor could have been made much less likely and may have been prevented. *The Defendant nurses[']*

*negligence was a substantial factor in bringing about the deteriorating health of Mr. Taylor and subsequently the death of Mr. Taylor.* The Defendant nurses should have anticipated the danger to Mr. Taylor when he was not adequately treated for pneumonia for over a month and said nurses should have realized this could lead to the deteriorating health of Mr. Taylor and eventually his death.

(Emphasis added.)

Concerning Terrell Manor, the report stated that a nursing home's nurses are the agents of the nursing home and that Terrell Manor is responsible for errors by its nurses. The report also stated Terrell Manor deviated from the standards of care by:

- failing to provide adequate or competent nursing staff and qualified supervision of the staff;
- failing to provide adequate policies and procedures for the evaluation of patients like Taylor;
- failing to have policies allowing the nurses to follow a chain of command and insist that a patient be evaluated by a doctor; and
- failing to educate the nursing staff appropriately.

The report stated, "The nurses in questions [sic], as well as, other nursing staff at Terrell Manor did not recognize the symptoms of pneumonia in Mr. Taylor, even given his medical history and did not render the proper treatment to Mr. Taylor, leading to his demise." The report also indicated, "If there was no chain of command for the nurses to call upon, then this directly contributed to the harms done to Mr. Taylor and his subsequent death." In discussing the adequacy and competence of the nursing staff, the report stated, "Had Terrell Manor had adequate or competent nursing staff, Mr. Taylor's health would not have reached such grave conditions and subsequently his death." "The nurses in question, as employees of the nursing home facility, failed to provide adequate care for Mr. Taylor and failed to follow any proper chain of command, if any, to ensure the proper care of Mr. Taylor, resulting in his demise."

Dr. Seignious concluded the substantive portion of his report,[1] stating,

If Terrell Manor and their employees, the nurses in question, had not deviated from the standards of care as outlined above, it is probable that the medical problems and subsequent death of Mr. Taylor could have been made much less likely. It is my opinion that Dr. Satyu as the physician for Terrell Manor, deviated from the standards of care, the nurses in question, that were employed by Terrell Manor and Terrell Manor, as mentioned above which led to the demise of Mr. Taylor. [sic] The Defendant Terrell Manor and its employees, the nurses in question, should have anticipated the danger to Mr. Taylor when he was not adequately treated for pneumonia for over a month and said nurses, and Terrell Manor should have realized this could lead to the deteriorating health of Mr. Taylor and eventually his death.

## ANALYSIS

### Judicial Admission Concerning Causation

 Appellants first argue that appellee judicially admitted during the hearing

---

1. The report also included deviations from the applicable standards of care by the physician, Dr. Satyu. Dr. Satyu is not a party to this appeal, so we need not consider the sufficiency of the report as to him.

on appellants' motion to dismiss that Dr. Seignious's report does not establish the causal link between appellants' alleged negligence and Taylor's death. During the hearing, at which no evidence was received, appellee's counsel began his argument to the trial court by stating that the findings in the report did not have to be based "on reasonable medical probability." While discussing the text of the report, appellee's counsel stated,

> He clearly states at the bottom of ten, that Terrell Manor and their employees, the nurses in question did not deviate from the standard of care as outlined above, it's probably that the medical problems and subsequent death of Mr. Taylor could have been much less likely. That's causation, that's it. And, this is not based on reasonable medical probability. Now, in deposition or in summary judgement hearing when they're arguing about whether or not he states the four reasons and one of them being pneumonia the other being other complications. I think at that point, that's a separate issue and we don't know yet because we haven't done any discovery. We're just trying to pursuant to the statue [sic], give notice as to what the claims are in the allegations that Terrell Manor failed to do what they should have done and based on that we are here. So, I think that the report is adequate as to that. We don't have to base it on reasonable medical probability at this stage of the litigation.

Appellants assert this argument constituted a judicial admission that Dr. Seignious did not know the cause of Taylor's death and that he could not link Taylor's death to any breach of a standard of care by appellants.

A judicial admission is a formal waiver of proof usually found in pleadings or stipulations. *Mendoza v. Fid. & Guar.*

*Ins. Underwriters, Inc.,* 606 S.W.2d 692, 694 (Tex.1980); *Duncan v. F–Star Mgmt., L.L.C.,* 281 S.W.3d 474, 481 (Tex.App.-El Paso 2008, pet. denied). A judicial admission is conclusive upon the party making it, and it relieves the opposing party's burden of proving the admitted fact, and bars the admitting party from disputing it. *Mendoza,* 606 S.W.2d at 694. A testimonial declaration that is contrary to a party's position is a "quasi-admission" and will be treated as a judicial admission only if (1) the declaration was made during the course of a judicial proceeding; (2) the statement is contrary to an essential fact embraced in the declarant's theory of recovery or defense; (3) the statement is deliberate, clear, and unequivocal; (4) giving conclusive effect to the declaration will be consistent with public policy; and (5) the statement is not destructive of the opposing party's theory of recovery. *Id.; Duncan,* 281 S.W.3d at 481. In this case, even if we assume appellee's counsel's statement is a judicial admission that Dr. Seignious did not know the exact sequence of biological events that resulted in Taylor's death, it is not a deliberate, clear, and unequivocal statement that Dr. Seignious's report does not link Taylor's death to any breach by appellants of the applicable standards of care. We therefore reject the argument that appellee judicially admitted that Dr. Seignious's report does not establish a causal link between appellants' alleged negligence and Taylor's death.

### Causation Information Within the Four Corners of the Report

Appellants also assert that, for several reasons, the information within the four corners of Dr. Seignious's report does not establish causation. We disagree.

### Report's Failure to Identify Exact Cause of Death

In claiming the report is deficient as to causation, appellants focus first on

the following statement: "The assessment at the ER in Terrell Medical Center was: Acute Respiratory Failure, requiring emergent intubation; septic shock; DIC (Disseminated Intravascular Coagulation) and Bibasilar Aspiration Pneumonia, among other things." Appellants argue that Dr. Seignious's report did not explain how these conditions and "other things," or which of them, were caused by appellees and led to Taylor's death. However, the issue is not whether the report identified the specific disease or condition that resulted in Taylor's death; the issue is whether the report articulated a causal relationship between appellants' alleged failure to meet the applicable standards of care and Taylor's death. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(r)(6) (expert report must articulate "the causal relationship between that failure [to meet the applicable standards of care] and the injury, harm, or damages claimed.").

Appellants cite *Perez v. Daughters of Charity Health Services*, No. 03–08–00200–CV, 2008 WL 4531558 (Tex.App.-Austin Oct. 10, 2008, no pet.) (mem. op.), in support of their argument that the report's failure to identify Taylor's exact cause of death renders the report insufficient. In *Perez*, the patient suffered from multiple sclerosis, and she went to the hospital with fever, nausea, vomiting, and head and facial twitching. *Id.* at *1. The patient died in the hospital three days later. The expert report's list of the failures to meet the applicable standards of care included paperwork mistakes as well as the nursing staff's failure to properly monitor the patient's vital signs and lab results, and the failure "to formulate a plan of care." *Id.* at *1–2. The expert report's statement of a causal relationship was two sentences:

> Failing to discover declining neurological status timely and failure to report any decline in neurological status delayed treatment ultimately causing

death. Failing to ascertain a complete history and physical and formulate a plan of care led to substandard care contributing to the death of Ms. Shappee.

*Id.* at *2. The court of appeals found this causation statement insufficient:

> [W]e find the two sentences on the causation element insufficient. The report does not link the hospital's actions to Shappee's death or any cause of death. Nor does it identify any specific injury that would have been prevented had the hospital complied with the standard of care.

*Id.* at *4.

In this case, however, the report indicated that with the proper antibiotics, Taylor's condition was treatable, but the nursing staff failed to observe, or failed to notify the physician, that Taylor was not responding appropriately to the current treatment. Further, the report indicated that Taylor's treatment was not changed, and his condition deteriorated to the point that the complications from the lack of appropriate treatment resulted in his death. Thus, unlike the report in *Perez*, the report in this case linked appellants' alleged failures to follow the applicable standards of care to Taylor's death.

Appellants also compare this case to *Northeast Medical Center, L.P. v. Crooks*, No. 06–05–00149–CV, 2006 WL 1358361 (Tex.App.-Texarkana May 19, 2006, no pet.) (mem. op.). In that case, the medical center was sued when a patient suffering from Alzheimer's fell in his hospital room at least two times and suffered a fractured hip. *Id.* at *1. Six months later, the patient died. The plaintiffs' petition alleged survivor actions based on the medical center's negligence in allowing the patient to fall, and a wrongful death action alleging the patient's death was the result

of complications from the patient's broken hip and subsequent surgery. *Id.* On the wrongful death claim, the expert report stated that the patient's fall "proximately caused the left hip fracture that started the slow deterioration of this 78 year old patient with multiple medical problems, who could not survive the challenges of a hip fracture, surgery, and significant recovery period." *Id.* The court of appeals concluded that this statement did not articulate a sufficient causal relationship between the patient's broken hip from the fall and his death six months later because there was no specific information in the report connecting the patient's fall and broken hip to his death. *Id.* at *6. In this case, however, there was not a six-month gap between the alleged negligence and the patient's death. Here, the report stated the nurses failed to diagnose, monitor, and treat Taylor's pneumonia properly, failed to communicate properly with Taylor's physician concerning Taylor's condition, and waited to transport him to a hospital until his respiratory problems were so severe that emergent intubation was required, followed by his death only five days later. *Crooks* is not analogous.

The statute requires that the report "provide a fair summary of the expert's opinions . . . regarding . . . the causal relationship" between appellants' alleged failure to meet the applicable standards of care and Taylor's death, and we conclude the trial court did not abuse its discretion in deciding the report articulated the required causal relationship, even though the report did not identify the precise cause of Taylor's death. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6).

### *Report's Failure to Address Taylor's Preexisting Conditions*

Appellants also argue the report is insufficient because it "made no attempt to address or explain the other numerous conditions from which Mr. Taylor was suffering, and their impact on his ultimate death." However, as this Court has observed, "Nothing in section 74.351 suggests the preliminary report is required to rule out every possible cause of the injury, harm, or damages claimed, especially given that section 74.351(s) limits discovery before a medical expert's report is filed." *Wallace,* 278 S.W.3d at 562; *see* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(s) (limiting discovery until after expert report is served). In *Arboretum Nursing & Rehab. Ctr. of Winnie, Inc. v. Isaacks,* No. 14–07–00895–CV, 2008 WL 2130446 (Tex.App.-Houston [14th Dist.] May 22, 2008, no pet.) (mem. op.), the patient, an elderly nursing home resident, suffered from skin ulcers that allegedly were not properly diagnosed and treated. An ulcer on the patient's leg became infected, and his leg was amputated. According to the expert report, the surgery further debilitated and weakened the patient, and he died of aspiration pneumonia. *Id.* at *1, 4. The nursing home defendant argued the plaintiffs' expert report was inadequate because the patient suffered from numerous preexisting conditions, but the report failed to eliminate those conditions beyond the nursing home's control as causes of the patient's injury or death. *Id.* at *5. The court of appeals held "that such an opinion is not required." *Id.* at *6. *But see Pisasale v. Ensign Group, Inc.,* No. 11–05–00196–CV, 2006 WL 2567400, at *4 (Tex.App.-Eastland Sept. 7, 2006, pet. denied) (mem. op.) (trial court did not abuse discretion in finding report insufficient when report did not eliminate preexisting conditions).

■ We conclude section 74.351 does not require at this early stage of the litigation that the report rule out each preexisting condition as a cause of, or factor contributing to, Taylor's death. Moreover,

the trial court could have reasonably concluded that the report did eliminate preexisting conditions as the cause of Taylor's death when it stated that if the nurses had followed the applicable standards of care, "the death of Mr. Taylor would not have occurred." *Cf. Arboretum Nursing & Rehab. Ctr.*, 2008 WL 2130446, at *6 (report addressed preexisting conditions by stating nothing in patient's history indicated ulcer was unavoidable or inevitable). We conclude the trial court did not abuse its discretion in denying appellants' motion to dismiss even though the report did not address Taylor's preexisting conditions.

### Sufficiency of Report's Assertions of Untimely Treatment

Appellants argue the report failed to establish a causal link between Taylor's death and appellee's claims of "untimely" treatment and other conduct because the report did not define when the treatment would have been "timely" or when the conduct became "untimely." In support of this argument, appellants rely on *McMenemy v. Holden*, No. 14–07–00365–CV, 2007 WL 4842452 (Tex.App.-Houston [14th Dist.] Nov. 1, 2007, pet. denied) (mem. op.). In that case, Holden, the plaintiff, lost vision in his left eye at about 6:30 p.m.,[2] and he arrived at a hospital about fifteen or twenty minutes later. *Id.* at *1. Holden was taken to Dr. McMenemy's office at 9:40 p.m., just over three hours after the vision loss, and he returned from Dr. McMenemy's office thirty minutes later (about 10:10 p.m.). The medical records did not show what services, if any, Dr. McMenemy rendered. At 10:50 p.m., Holden signed a release for the administration of Retavase and received the first dose at 10:58 p.m. When there was no improvement in Holden's condition, he was admitted to the hospital at 12:30 a.m. under the care of another doctor. *Id.* Holden sued Dr. McMenemy for medical malpractice. The expert report concluded that Dr. McMenemy failed "to timely and properly administer first aid" to Holden's eye and failed "to timely perform a paracentesis" of Holden's eye. *Id.* at *4. The report listed the treatment Dr. McMenemy should have rendered and concluded, "if Dr. McMenemy had timely treated Mr. Holden in this manner, he could have regained the sight in his left eye." *Id.* at *3. The court of appeals found that without a definition of "timely" the report failed to provide a basis for the trial court to conclude that Holden's claims had merit: "Specifically, we cannot determine from this report whether the opportunity for 'timely' intervention was still available at the time that Dr. McMenemy examined Holden, and whether it was probable that performance of the first aid measures described would have reversed Holden's vision loss." *Id.* at *4. The report did not show that "timely" treatment was still possible when Dr. McMenemy saw Holden. *Id.* The timing problem in *McMenemy* does not exist in this case. Here, Taylor was under appellants' care prior to the symptoms leading to his pneumonia and from the onset of those symptoms until Taylor's admission to Terrell Medical Center. Thus, unlike the situation in *McMenemy*, timely treatment by appellants was always possible. Also, in *McMenemy*, the court of appeals observed that the expert report "expresses no opinion that, more than three hours after losing his sight, it was more likely than not that Holden's vision would be restored by any of the acts that [the report] identifies as required by

---

2. The opinion states that 9:40 p.m. was "just over three hours after the vision loss."

*McMenemy*, 2007 WL 4842452, at *1.

the standard of care." *Id.* at *5. In this case, the report states that if the nurses had followed the standards of care for treating Taylor, "the death of Mr. Taylor would not have occurred." *McMenemy* does not demonstrate that the trial court in this case abused its discretion in denying appellants' motion to dismiss.

### Whether the Report's Conclusions Rise Above Mere Conjecture

Appellants also argue that the conclusions in the report couched in terms of "possibility" and "chance" failed to rise above mere conjecture. In *Bowie Memorial Hospital v. Wright*, 79 S.W.3d 48 (Tex. 2002) (per curiam), the plaintiff was injured in a car accident and suffered multiple injuries. *Id.* at 50. A physician's assistant X-rayed the plaintiff's right foot and knee and diagnosed her broken patella. However, the physician's assistant allegedly failed to properly interpret an X-ray showing the plaintiff had suffered a fractured foot. The fractured foot was not discovered until after the plaintiff had surgery for her knee injury. The plaintiff claimed that the surgeon could have operated on her foot at the same time as her knee if he had known about it. Instead, the plaintiff had two additional surgeries. *Id.* The expert report, however, contained only the following statement on causation: "if the x-rays would have been correctly read and the appropriate medical personnel acted upon those findings then Wright would have had the possibility of a better outcome." *Id.* at 52–53. The supreme court held this statement was insufficient to show causation because the report did not explain how the hospital's conduct caused injury to the plaintiff. *Id.*

▆ In this case, appellants point to similar language in Dr. Seignious's report, including:

- "If the proper treatment would have been rendered by the Nurses in question, and Dr. Satyu, then there was the possibility of a better outcome for Mr. Taylor. In this case, Mr. Taylor was not given that chance."

- "In addition, it is the possibility that the Terrell Manor has more direct responsibility in this case. . . ."

- "If M.A. Stewart, RN, FNP and B. Allen, LVN or other personnel at Terrell Manor had not deviated from the standards of care as outlined above, it is within reasonable medical probability that the medical problems and subsequent death of Mr. Taylor could have been made much less likely and may have been prevented."

Dr. Seignious's report, however, contains other statements that are not based on "chance" or "possibility" linking appellants' alleged deviations from the applicable standards of care to Taylor's death, including:

- "Given proper treatment, Mr. Taylor suffered from a treatable condition; however, without proper treatment, such condition can lead to further complications and death, which was the end result for Mr. Taylor in this case."

- "Because of [the nurses' and Dr. Satyu's] negligence, he was allowed to deteriorate to the point that treatment could not reverse the complications from lack of treatment and he died as a result."

- "If these standards had been followed, the death of Mr. Taylor would not have occurred."

- "The Defendant nurses['] negligence was a substantial factor in bringing about the deteriorating health of Mr. Taylor and subsequently the death of Mr. Taylor. The Defendant nurses should have anticipated the danger to Mr. Taylor when he was not adequate-

ly treated for pneumonia for over a month and said nurses should have realized this could lead to the deteriorating health of Mr. Taylor and eventually his death."

• "It is my opinion that M.A. Stewart, RN, FNP and B. Allen, LVN, as nurses presumably employed by the Terrell Manor, deviated from the standards of care mentioned above which lead [sic] to the demise of Mr. Taylor."

• "The specific deviations from the standard of care for Terrell Manor including the following, as well as the fact that Terrell Manor, nursing home nurses work as the agents of the nursing homes [sic]; and therefore the Terrell Manor is responsible for errors by its nurses."

• "Had Terrell Manor had adequate or competent nursing staff, Mr. Taylor's health would not have reached such grave conditions and subsequently his death."

Thus, unlike the expert report in *Bowie Memorial Hospital*, the report in this case contains statements that rise above mere conjecture and articulate a causal relationship between appellants' alleged failure to meet the applicable standards of care and Taylor's death. We conclude these statements permitted the trial court to determine, without abusing its discretion, that Dr. Seignious's report articulated a causal relationship between appellants' alleged failure to meet the applicable standards of care and Taylor's death.

## CONCLUSION

We conclude appellants have not shown the trial court abused its discretion in denying appellants' motion to dismiss this case for failure to serve an adequate expert report as required by section 74.351 of the civil practice and remedies code.

We resolve appellants' sole issue against them.

We affirm the trial court's order.