**Affirmed and Opinion Filed November 12, 2024**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-24-00371-CV**

**FRISCO ER FACILITY, LLC D/B/A FRISCO ER, Appellant**
**V.**
**SUMER MCCARLEY INDIVIDUALLY AND AS PERSONAL**
**REPRESENTATIVE OF THE ESTATE OF REX MCCARLEY**
**(DECEASED), Appellee**

**On Appeal from the 429th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 429-05327-2023**

## MEMORANDUM OPINION

Before Justices Molberg, Breedlove, and Kennedy
Opinion by Justice Breedlove

In this interlocutory appeal, we consider whether two expert reports filed by Appellee to support a healthcare liability claim against Appellant meet the requirements of section 74.351 of the civil practice and remedies code. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351. We conclude that they do, and we affirm the trial court's order overruling Frisco ER's objections to the reports and denying its motion to dismiss.

## BACKGROUND

Decedent Rex McCarley[1] presented to the Frisco ER on November 9, 2022, complaining of chest pain. An electrocardiogram (EKG/ECG) was done with results that included "sinus rhythm, possible left atrial enlargement, non-specific t-wave abnormality, [and] borderline ECG[.]" Rex was discharged after the EKG was done. Five days later, on November 14, 2022, Rex suffered a fatal cardiac arrest. Dr. Rohr, a county medical examiner, performed an autopsy and reported the cause of death as "severe coronary artery disease due to atherosclerosis." The autopsy identified an enlarged heart and 80–90% stenosis in coronary arteries. The autopsy showed evidence of severe systemic atherosclerotic cardiovascular disease with findings consistent with longstanding hypertension.

Appellant Sumer McCarley sued Appellee Frisco ER Facility, LLC d/b/a Frisco ER (Frisco ER)[2] alleging that Frisco ER failed to diagnose Rex's cardiac condition and that this proximately caused his sudden cardiac arrest five days later. She served an initial expert report as required under Chapter 74 of the civil practice and remedies code. TEX. CIV. PRAC. & REM. CODE ANN. §§ 74.001–74.507 ("Chapter 74"). Seth Womack, MD, an emergency room physician, prepared an initial report on Sumer's behalf. Frisco ER objected to the report, arguing that the

---

[1] For clarity, we refer to appellee Sumer McCarley as "Sumer," and we refer to decedent Rex McCarley as "Rex."

[2] Sumer also sued Amir Ahmed, MD, but on October 16, 2023, the trial court granted Sumer's unopposed motion to substitute Dr. Shrirang Neurgaonkar as the proper defendant. Dr. Neurgaonkar is not a party to this appeal.

report did not meet Chapter 74's requirements. Sumer then served an amended report. Frisco ER objected to the amended report and the qualifications of Dr. Womack. Sumer subsequently served a report of cardiologist David Turbay, MD, followed almost immediately by an amended report by Dr. Turbay. Frisco ER objected to both Dr. Turbay's initial and amended reports and filed a motion to dismiss for failure to comply with the requirements of Chapter 74.

The trial court held a hearing on Frisco ER's objections to the expert reports and motion to dismiss on March 6, 2024. The following day, the trial court entered an order overruling Frisco ER's objections to the expert reports and denying Frisco ER's motion to dismiss. On March 27, 2024, Frisco ER timely filed its notice of accelerated interlocutory appeal.

In a single issue with multiple sub-parts, Frisco ER contends the trial court erred by overruling its objections to Sumer's Chapter 74 expert reports and denying its motion to dismiss. It alleges:

1. Dr. Womack is not qualified to offer causation opinions regarding any likely cardiology treatment available to Rex nor the efficacy of any such treatment;

2. Dr. Womack's report failed to satisfy the good faith requirement of describing the applicable standard of care nor how it was allegedly breached by Frisco ER;

3. Dr. Womack's report failed to satisfy the good faith requirement of describing how any breach in the standard of care proximately caused Rex's death;

4. Dr. Turbay's report failed to satisfy the good faith requirement of describing how or why any breach in the standard of care by Frisco ER proximately caused Rex's death.

## STANDARD OF REVIEW

We review a trial court's ruling on the sufficiency of an expert's report for abuse of discretion. *Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 142 (Tex. 2015) (per curiam); *Nexion Health at Terrell Manor v. Taylor*, 294 S.W.3d 787, 791 (Tex. App.—Dallas 2009, no pet.). A trial court abuses its discretion if it acts arbitrarily, unreasonably, or without reference to any guiding rules or principles. *Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010). The trial court has no discretion in determining what the law is or applying the law to the facts. *Sanchez v. Martin*, 378 S.W.3d 581, 587 (Tex. App.—Dallas 2012, no pet.). A clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion. *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992) (orig. proceeding). But a trial court does not abuse its discretion merely because it decides a discretionary matter differently than an appellate court would under similar circumstances. *Taylor*, 294 S.W.3d at 791.

## DISCUSSION

An expert report under section 74.351 must represent a good-faith effort to provide a fair summary of the expert's opinions. *See Am. Transitional Care Ctrs. of*

*Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878–79 (Tex. 2001)[3]. The report need not marshal all the plaintiff's proof but must include the expert's opinion on each of the elements identified in the statute. *Id.* To constitute a good-faith effort, the report must (1) inform the defendant of the specific conduct the plaintiff has called into question; and (2) provide a basis for the trial court to conclude the claims have merit. *Id.* at 879. In addition, "the expert report must make a good-faith effort to explain, factually, how proximate cause is going to be proven," although the report need not use the words "proximate cause," "foreseeability," or "cause in fact." *Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 460 (Tex. 2017). "'[T]he expert must explain the basis of his statements to link his conclusions to the facts.'" *Id.* (quoting *Earle v. Ratliff*, 998 S.W.2d 882, 890 (Tex. 1999)). "[C]ourts must view the report in its entirety, rather than isolating specific portions or sections, to determine whether it includes" the required information. *Baty v. Futrell*, 543 S.W.3d 689, 694 (Tex. 2018).

---

[3] *Palacios*, among other older cases cited in this opinion, were decided based on an older version of the statutory scheme that is now known as Chapter 74. *See Park v. Lynch*, 194 S.W.3d 95, 99 (Tex. App.—Dallas 2006, no pet.). In 2003, the Texas Legislature repealed article 4590i of the Revised Civil Statutes and recodified many substantially amended provisions of former article 4590i in chapter 74 of the Civil Practice and Remedies Code. *See* Act of June 2, 2003, 78th Leg., R.S., ch. 204., §§ 10.01, 10.09, 2003 Tex. Gen. Laws 847, 864–82, 884. While the recodified version made significant revisions to the procedure for filing expert reports in healthcare liability claims, the good faith requirements, as relevant in this case, remained the same. *See, e.g., Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 223 (Tex. 2018) (citing to, and applying, cases such as *Palacios* that were decided under article 4590i to cases under chapter 74 with regard to determining whether expert reports satisfied the good faith requirement).

## A.  Seth Womack, MD

### 1.  *Dr. Womack's Qualifications*

In its first sub-issue, Frisco ER argues that Dr. Womack is not qualified to offer causation opinions regarding any likely cardiology treatment available to Rex nor the efficacy of any such treatment. Specifically, it argues that Dr. Womack is not qualified because emergency room physicians like Dr. Womack are not qualified to offer cardiology opinions. Sumer responds that Dr. Womack's report demonstrates he has the requisite expertise to opine about causation of Rex's injury and that this case does not require the opinion of a cardiologist to opine on the sufficiency of Rex's emergency care.[4]

Section 74.403 of Chapter 74 sets out the criteria necessary for an expert to opine on causation. TEX. CIV. PRAC. & REM. CODE ANN. § 74.403(a). To qualify as an expert on the causal relationship between an alleged departure from accepted standards of care and a plaintiff's injury, the person must be a physician and "otherwise qualified to render opinions" on causation under the Texas Rules of Evidence. *Id.* Rule of evidence 702 permits "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education" to testify in the form of an opinion if the testimony would "help the trier of fact to understand the evidence or

---

[4] Sumer also asserts that even if the opinion of a cardiologist were required, she provided one in the form of Dr. Turbay's report, and that any gaps in Dr. Womack's reports can be filled by Dr. Turbay's report by reading them in tandem. Because we conclude Dr. Womack is sufficiently qualified on the specific standard of care involved in this case, we need not reach Sumer's alternative argument. *See* TEX. R. APP. P. 47.1.

to determine a fact in issue." TEX. R. EVID. 702. The party offering the witness as an expert must establish that the witness is qualified to testify under rule 702 by demonstrating the witness has expertise concerning the actual subject matter about which the party is offering an opinion. *Mem'l Hermann Healthcare Sys. v. Burrell*, 230 S.W.3d 755, 762 (Tex. App.—Houston [14th Dist.] 2007, no pet.).

In determining whether a witness is qualified on the basis of training or experience, the court shall consider whether, at the time the claim arises or at the time testimony is given, the witness is "board certified or has other substantial training or experience in an area of medical practice relevant to the claim" and is "actively practicing medicine in rendering medical care services relevant to the claim." TEX. CIV. PRAC. & REM. CODE ANN. § 74.401(c). The trial court should focus on the medical expert's "knowledge, skill, experience, training, or education" concerning the specific issue before the court which would qualify the expert to give an opinion on that particular subject. *Roberts v. Williamson*, 111 S.W.3d 113, 122 (Tex. 2003). The trial court's focus should not necessarily be on the specialty of the medical expert. *Pediatrix Med. Servs. Inc. v. De La O*, 368 S.W.3d 34, 39 (Tex. App.—El Paso 2012, no pet.).

Dr. Womack is a medical doctor licensed in Texas, Wisconsin, and Louisiana, is board certified by the American Board of Emergency Medicine, has over 20 years of emergency medicine experience and has been board certified for over 14 years. He has experience working at a freestanding emergency medical care facility like

the one in this case and has worked with and supervised emergency room nurses, advanced practice providers, and other ER staff members since his residency.

Frisco ER argues Dr. Womack does not have the expertise to opine about whether earlier treatment for a cardiac condition would have prevented Rex's death because "[t]o be qualified to offer such opinions, the expert report of Dr. Womack must describe his qualifications to render opinions regarding cardiac diagnoses, cardiac treatment, and the efficacy of specific cardiac treatments." But Dr. Womack explained that as a board-certified emergency medicine practitioner, he was required to "demonstrate knowledge in cardiac emergencies and diseases," and has "demonstrated the core knowledge of cardiovascular (cardiac) disorders," which includes, at minimum, "evaluating and treating patients with chest pain and severe coronary artery disease," such as that seen in Rex. Further, Dr. Womack testified to the following relevant experience:

> Most every emergency department shift that I work, my practice includes the following:
>
> 1. I evaluate and care for patients with chest pain that have coronary disease.
>
> 2. I make cardiac diagnoses, evaluate chest pain/cardiac patients according to the standard of care, and treat cardiac conditions.
>
> 3. I follow up on chest pain patients that I have admitted and were evaluated by a cardiologist.

Dr. Womack also explained his familiarity with the typical treatment plan for patients properly diagnosed with Rex's condition, as well as the prognosis for those

who are not, based on his experience treating and following up with patients as well as his education in cardiovascular emergencies.

To support its argument, Frisco ER relies on *Hambrick v. Dominguez*, No. 05-17-00003-CV, 2017 WL 2536916 (Tex. App.—Dallas June 12, 2017, no pet.) (mem. op.). In *Hambrick*, we held that an emergency room physician lacked the qualifications necessary to opine on the cause of a patient's cardiac arrest where plaintiffs alleged the decedent was injured when his tracheostomy tube was dislodged while being repositioned by the nursing staff. *Id.* at *14–15. We explained that the report of plaintiff's causation expert discussed the appropriate response by a physician when a patient's tracheostomy tube is dislodged and the patient suffers from hypoxia, but it did not show that the expert had the knowledge, skill, experience, training, or education concerning the specific issues presented. *Id.* However, this case is distinguishable from *Hambrick*. Unlike in *Hambrick*, Dr. Womack's report specifically demonstrates his knowledge, skills, experience, training, and education concerning the medical conditions and standard of care at issue in this case. Contrary to Frisco ER's assertions, it is Frisco ER's alleged negligence regarding the sufficiency of the emergency diagnosis and treatment Rex received that is at issue in this case, and Dr. Womack's report adequately demonstrates his qualifications in that respect. Dr. Womack's report does not suffer from the fatal flaws of the *Hambrick* expert report and does not require us to "fill in

gaps in the report by drawing inferences[.]" *See id.* at \*5 (quoting *Methodist Hosps. of Dallas v. Winn*, 496 S.W.3d 148, 152 (Tex. App.—Dallas 2016, no pet.).

We conclude the trial court did not abuse its discretion by determining that Dr. Womack was qualified to provide an opinion on causation. *See Roberts*, 111 S.W.3d at 122 (trial court did not abuse discretion by admitting expert's testimony on plaintiff's neurological issues; although doctor was not neurologist, he had experience and expertise regarding the specific causes and effects of plaintiff's injuries); *Baylor Univ. Med. Ctr. v. Rosa*, 240 S.W.3d 565, 572 (Tex. App.—Dallas 2007, pet. denied) (concluding expert's causation opinions provided sufficient basis for trial court to conclude that plaintiff's claims had merit). We decide Frisco ER's first sub-issue against it.

### 2. *Applicable Standard of Care and Breach in Dr. Womack's Report*

In its second sub-issue, Frisco ER argues that Dr. Womack's report failed to satisfy the good faith requirement of describing the applicable standard of care or how it was allegedly breached by Frisco ER and that the report is speculative, vague, and conclusory. Specifically, Frisco ER highlights the following three issues with Dr. Womack's report with regard to the standard of care and breach:

- Dr. Womack does not explain what "life threatening medical pathology" should be ruled in or out nor how Frisco ER should go about doing this so as to meet the standard of care.

- Dr. Womack also does not explain how Mr. McCarley was unstable nor how he should have been stabilized.

- Dr. Womack also never explains how an unstable patient was able to go home and go about his daily activities for five days in an unstable condition.

Sumer disagrees, arguing both that Dr. Womack sufficiently explains all three items above in other areas of his report and that the recommendations that Frisco ER points to are just three items in a list of eleven specific actions that Dr. Womack explains were required to meet the standard of care, actions which Frisco ER failed to take.

To adequately identify the standard of care, an expert report must set forth "specific information about what the defendant should have done differently." *Palacios*, 46 S.W.3d at 880. While the Act requires only a "fair summary" of the standard of care and how it was breached, "even a fair summary must set out what care was expected, but not given." *Id.* (quotation omitted).

Dr. Womack's report identifies actions Frisco ER was expected to take upon being presented with a patient complaining of chest pain and identifies which of those actions Frisco ER failed to take. Specifically, Dr. Womack opines:

> the applicable standard of care required Frisco ER to appropriately evaluate and treat Mr. McCarley, which consisted of but was not limited to the following:
>
> 1. Bringing him to a patient treatment room;
>
> 2. Placing him on a continuous cardiac monitor that would have shown and alarmed to any heart rhythm abnormalities that occur from severe coronary disease in patients such as Mr. McCarley;
>
> 3. Placing a peripheral intravenous (IV) line;

4. Treating his chest pain by administering nitroglycerin pills and/or other pain medicines until he was chest pain free;

5. Obtaining labs including b[ut] not limited to a CBC, CMP, PT, PTT, INR, and serial troponins. Troponin is a lab that will highly likely be abnormal in patients with cardiac ischemia. Given that some of Mr. McCarley's coronary arteries were nearly totally occluded, within a reasonable degree of medical probability, Mr. McCarley's chest pain was cardiac in nature;

6. Obtaining imaging of his chest such as a chest x-ray or CT scan;

7. Ruling in and/or out life threatening medical pathology;

8. Properly assessing and diagnosing Mr. McCarley and informing him of that assessment and diagnosis;

9. Stabilizing Mr. McCarley;

10. Transferring Mr. McCarley to a higher level of care to be admitted and evaluated by a cardiologist;

11. Obtaining repeat EKGs for continued chest pain.

Dr. Womack explains that the standard of care required Frisco ER to "appropriately evaluate and treat Mr. McCarley" using the specific steps he identified and that Frisco ER breached that standard of care by failing to "properly obtain a diagnosis of Mr. McCarley's condition and to communicate to him that diagnosis and proper plan of treatment that met the standard of care." We conclude that Dr. Womack's report includes "specific information about what the defendant should have done differently." *See Palacios*, 46 S.W.3d at 880. Although Frisco ER identifies areas of the report where Dr. Womack could have been more specific or detailed, the legal requirement is that a plaintiff must provide only a "fair summary,"

not a perfect one. *See id.* Dr. Womack's report provided sufficient detail regarding the applicable standard of care and adequately informed Frisco ER of the specific conduct that Sumer has called into question. *See id.* at 879. We decide Frisco ER's second sub-issue against it.

### 3. *Proximate Cause in Dr. Womack's Report*

In its third sub-issue, Frisco ER argues that Dr. Womack's report failed to satisfy the good faith requirement of describing how any breach in the standard of care proximately caused Rex's death. It contends that Dr. Womack's report fails to "[e]xplain why Rex McCarley would have undergone a cardiac catheterization, what would have been shown by this procedure, no[r] why it would have included stents or bypass surgery." Sumer disagrees, arguing that Dr. Womack's report describes how Frisco ER's failure to properly evaluate Rex and perform diagnostic tests led Rex's stenosis and coronary artery disease to go undiagnosed, which led to him not receiving treatment, which led to his death.

To establish a causal relationship between the injury and the defendant's negligent act or omission, the expert report must show the defendant's conduct was a substantial factor in bringing about the harm, and, absent this act or omission, the harm would not have occurred. *Mitchell v. Satyu, M.D.*, No. 05–14–00479–CV, 2015 WL 3765771, at *4 (Tex. App.—Dallas June 17, 2015, no pet.) (mem. op.). Causation is generally established through evidence of a "reasonable medical probability" that the injury was caused by the negligence of the defendant, meaning

that it is more likely than not that the ultimate harm or condition resulted from such negligence. *See id.* "An expert may show causation by explaining a chain of events that begins with a defendant doctor's negligence and ends in injury to the plaintiff." *Acharya v. Gomez*, No. 05-18-00833-CV, 2019 WL 1923213, at *5 (Tex. App.—Dallas Apr. 30, 2019, pet. denied) (mem. op.) (quoting *Mitchell*, 2015 WL 3765771, at *4). The report must explain "to a reasonable degree, how and why the breach [of the standard of care] caused the injury based on the facts presented." *Id.* (quoting *Mitchell*, 2015 WL 3765771, at *4 (internal quotations omitted); *Quinones v. Pin*, 298 S.W.3d 806, 814 (Tex. App.—Dallas 2009, no pet.) (to satisfy Chapter 74's requirement of a showing of causation, expert report must include fair summary of expert's opinion regarding causal relationship between breach of standard of care and injury, harm, or damages claimed). "We determine whether a causation opinion is sufficient by considering it in the context of the entire report." *Mitchell*, 2015 WL 3765771, at *4 (citing *Ortiz v. Patterson*, 378 S.W.3d 667, 671 (Tex. App.—Dallas 2012, no pet.)); *Bakhtari v. Est. of Dumas*, 317 S.W.3d 486, 496 (Tex. App.—Dallas 2010, no pet.).

Frisco ER relies on a prior case from our sister court in which a different report written by Dr. Womack failed to satisfy the statutory requirements because "although Dr. Womack described in significant detail his opinions about [defendant's] breaches of the standards of care, he never offered any opinions or explanations, using magic words, conclusions or otherwise, about how those

–14–

breaches caused injury or death to [plaintiff]." *Northcutt v. Stephens*, No. 02-21-002217-CV, 2022 WL 60720, at *4 (Tex. App.—Fort Worth Jan. 6, 2022, no pet.) (mem. op.). In *Northcutt*, the Fort Worth Court of Appeals noted that "[t]he need to explain the causal connection between breaches of the standards of care and the claimed injury or death is particularly acute in cases where the allegations are that a patient, who had a pre-existing condition, would have experienced a better outcome had earlier diagnosis or treatment been undertaken. *Id.* (internal citations omitted).

In contrast to *Northcutt*, in this case Dr. Womack provides significant detail regarding how Frisco ER's alleged breaches proximately caused Rex's death:

> With a reasonable degree of medical probability and/or certainty, it is my professional opinion that the negligence [described above] of the Frisco ER was the proximate cause of Rex McCarley's injury and death. Because of the Frisco ER's multiple breaches of the standard of care, Mr. McCarley suffered the worst outcome. The Frisco ER's multiple breaches caused Mr. McCarley not to be emergently evaluated by a cardiologist. By Mr. McCarley not being emergently evaluated by a cardiologist, his severe and significant stenosis to his LAD and other coronary arteries went undiagnosed, and he died as a result of severe coronary artery disease due to atherosclerosis. Within a reasonable degree of medical probability, Mr. McCarley's presenting symptoms to the Frisco ER were cardiac in nature based on Dr. Rohr's (county medical examiner) conclusive opinion that Mr. McCarley died as a result of severe coronary artery disease due to atherosclerosis. Some of Mr. McCarley's coronary arteries were nearly totally occluded. Had the Frisco ER complied with the standard of care, given the life threatening state of Mr. McCarley's coronary arteries, a resultant component of the Frisco ER's universal evaluation would have prompted the Frisco ER to emergently transfer Mr. McCarley to a higher level of care where he would have been evaluated by a cardiologist. Given the life threatening state of Mr. McCarley's coronary arteries, a component of the universal evaluation by a cardiologist would then have prompted Mr. McCarley to have a cardiac catheterization where he would have received stents

–15–

or cardiac bypass surgery to relieve his near totally occluded coronary arteries, which would have saved his life.

In the section of the report quoted above, Dr. Womack's report describes the specific sequence of events initiated by Frisco ER's failure to follow the standard of care that ultimately led to Rex's death, discussing how each breach of the standard of care prevented Rex from obtaining the lifesaving diagnosis and treatment that would have been readily apparent if the standard of care had been followed. Unlike in *Northcutt*, the causal links described in the report in this case do not require the Court to draw impermissible inferences outside of the four corners of the report. *See id.*

We conclude that Dr. Womack's report provides a fair summary of his opinions regarding the causal relationship between the breaches of the standard of care he identifies and Rex's death. *See Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 225–26 (Tex. 2018) (per curiam) (expert report sufficient that linked conclusion with underlying facts); *Baty*, 543 S.W.3d at 698; *Miller v. JSC Lake Highlands Operations, LP*, 536 S.W.3d 510, 515 (Tex. 2017) (per curiam). In *Abshire*, *Baty*, and *Miller*, expert reports were sufficient to meet Chapter 74's causation requirements where they explained the applicable standard of care, described how the health care provider breached that standard, and explained how that breach caused the plaintiff's injury. *See Abshire*, 563 S.W.3d at 225–26; *Baty*, 543 S.W.3d at 698; *Miller*, 536 S.W.3d at 515. Here, Dr. Womack "'make[s] a good faith effort to explain, factually, how proximate cause is going to be proven'" by

describing how and why Frisco ER's breaches of the standard of care caused Rex's death. *See Miller*, 536 S.W.3d at 515 (quoting *Zamarripa*, 526 S.W.3d at 460). We conclude that Dr. Womack's opinions regarding why following the standard of care would have resulted in the provision of life-saving treatment for Mr. McCarley "adequately explain[ ] the links in the causal chain." *See Abshire*, 563 S.W.3d at 225. We decide Frisco ER's third sub-issue against it.

**B.      David Turbay, MD**

In its final sub-issue, Frisco ER argues that Dr. Turbay's report failed to satisfy the good faith requirement of describing how Frisco ER breached the standard of care and how any breach caused Rex's death.

*1.      Breach of the Standard of Care in Dr. Turbay's Report*

As discussed in more detail above, an expert report must set forth "specific information about what the defendant should have done differently." *Palacios*, 46 S.W.3d at 880. To satisfy Chapter 74, the expert report "must set out what care was expected, but not given." *Id.* (quotation omitted). Frisco ER highlights the following three issues with Dr. Turbay's report with regard to breach:

- Dr. Turbay assumes, but never explains, that [the guidelines promulgated by the American College of Cardiology (ACC)/American Heart Association (AHA) of evaluating patients with complaints of chest pain syndrome] are applicable to the treatment of Rex McCarley by Frisco ER.

- Nowhere in his expert report does Dr. Turbay define chest pain syndrome nor explain what symptomology of Rex McCarley falls within the criteria of "chest pain syndrome."

–17–

- Dr. Turbay…never identifies what portions [of the guidelines] were not met by Frisco ER. Dr. Turbay explains these guidelines are followed to determine whether a patient should be admitted or discharged home based upon their relative risk level of high, intermediate, or low but never describes where Rex McCarley falls on that continuum, what decisions should have been made through application of the guidelines, nor, importantly, why he would have a particular risk category assigned to him.

Sumer disagrees, arguing that "[t]aken in context, Dr. Turbay's report sufficiently demonstrates that Frisco ER breached the applicable standard of care by failing to take *any* of the necessary steps outlined in the ACC/AHA chest pain syndrome guidelines," and that, irrespective of those guidelines, Frisco ER also "failed to evaluate Mr. McCarley's clinical condition, failed to review his ECG, failed to determine whether his acute chest pain was cardiac, noncardiac, or possibly cardiac" and that the lack of medical records for Mr. McCarley's visit in itself is also a violation of the standard of care according to the Texas Medical Board.

Dr. Turbay's report identifies actions Frisco ER was expected to take upon being presented with a patient complaining of chest pain and identifies which of those actions Frisco ER failed to take. Specifically, Dr. Turbay opines:

The following are the relevant Class 1 recommendations for the evaluation of a [chest pain syndrome][5] patient such as [Rex] in the ER according to the current ACC/AHA guidelines:

---

[5] Two of Frisco ER's three complaints about Dr. Turbay's report assert that he fails to define "chest pain syndrome" or explain why that term is applicable to Rex. However, the specific list of items in the ACC/AHA recommendations that Dr. Turbay asserts Frisco ER failed to follow are designed for "patients presenting with chest pain," not "patients with chest pain syndrome;" therefore, Frisco ER's arguments regarding chest pain syndrome are irrelevant to the assessment of whether Dr. Turbay adequately demonstrated breach of the standard of care because the term "patient presenting with chest pain" inarguably applies to Rex.

–18–

1. An initial assessment of chest pain is recommended to triage patients effectively based on the likelihood that symptoms may be attributable to myocardial ischemia.

2. Chest pain should not be described as atypical, because it is not helpful in determining the cause and can be misinterpreted as benign in nature. Instead, chest pain should be described as cardiac, possibly cardiac, or noncardiac because these terms are more specific to the potential underlying diagnosis.

3. In patients with chest pain, a focused history that includes characteristics and duration of symptoms relative to presentation as well as associated features, and cardiovascular risk factor assessment should be obtained.

4. In patients with chest pain, a focused cardiovascular examination should be performed initially to aid in the diagnosis of acute coronary syndrome (ACS) or other potentially serious causes of chest pain (e.g. aortic dissection, pulmonary embolism (PE), or esophageal rupture) and to identify complications.

5. In all patients who present with acute chest pain regardless of the setting, an ECG should be acquired and reviewed for STEMI within 10 minutes of arrival.

6. In all patients presenting to the ED with acute chest pain and suspected ACS, cardiac troponin (cTn) should be measured as soon as possible after presentation.

7. In patients with chest pain in which an initial ECG is nondiagnostic, serial ECGs to detect potential ischemic changes should be performed, especially when clinical suspicion of ACS is high, symptoms are persistent, or the clinical condition deteriorates.

8. In patients presenting with acute chest pain, a chest radiograph (Xray) is useful to evaluate other potential cardiac, pulmonary, and thoracic causes of symptoms.

9. In patients presenting with acute chest pain, serial cTn or troponin (T) levels are useful to identify abnormal values and a rising or falling pattern indicative of acute myocardial injury.

10. In patients presenting with acute chest pain, high-sensitivity cTn is the preferred biomarker because it enables more rapid detection or exclusion of myocardial injury and increases diagnostic accuracy.

11. In patients presenting with acute chest pain and suspected ACS, clinical decision pathways (CDPs) should categorize patients into low-, intermediate-, and high-risk strata to facilitate disposition and subsequent diagnostic evaluation. In the evaluation of patients presenting with acute chest pain and intervals after the initial troponins are indicated to exclude myocardial injury, recommended time intervals after the initial troponin sample collection (time zero) for repeat measurements are: 1 to 3 hours for high-sensitivity troponin and 3 to 6 hours for conventional troponin assays.

12. For intermediate-risk patients with acute chest pain, a transthoracic echocardiogram (TTE) is recommended as a rapid, bedside test to establish baseline ventricular and valvular function, evaluate for wall motion abnormalities, and to assess for pericardial effusion.

Dr. Turbay explains that the standard of care required Frisco ER to follow the ACC/AHA guidelines for evaluating patients presenting with chest pain and that Frisco ER breached that standard of care by failing to provide an adequate evaluation and treatment of Rex's condition in compliance with the guidelines he described when he presented with complaints of chest pain. We conclude that Dr. Turbay's report includes "specific information about what the defendant should have done differently." *See Palacios* at 880. Dr. Turbay's report provided sufficient detail

regarding the applicable standard of care and adequately informed Frisco ER of the specific conduct that Sumer has called into question. *See id.* at 879.

### 2. *Proximate Cause in Dr. Turbay's Report*

Frisco ER also argues that Dr. Turbay's report failed to satisfy the good faith requirement of describing how any breach in the standard of care proximately caused Rex's death. It contends that Dr. Turbay's causation opinions are conclusory. Specifically, Frisco ER identifies the following four issues with regard to proximate cause in Dr. Turbay's report:

- [Dr. Turbay] offers the opinion that a chest pain syndrome evaluation should have been done based on the undefined "clinical presentation" of Rex McCarley and that this would have resulted in invasive evaluation of Rex McCarley's coronary arteries.

- Dr. Turbay then describes implementation of "appropriate medical therapy" to improve symptoms without explaining what medical therapy would be appropriate or how it would alleviate any symptoms.

- Dr. Turbay offers the conclusory opinion that additional testing with undefined outcomes would have led to an undefined invasive evaluation that would have resulted in the diagnosis of severe coronary artery disease and the performance of a surgical revascularization with a coronary artery bypass graft (CABG).

- Dr. Turbay then opines that Rex McCarley's outcome after CABG would have been excellent based on his age and body habitus but never explains why either of these factors is important nor why they would indicate an excellent outcome for Rex McCarley.

Sumer disagrees, arguing that Frisco ER's argument is based upon the incorrect premise that Rex's clinical presentation was "undefined," noting that it is undisputed

that Rex presented to Frisco ER "with complaints of chest pain syndrome" and "signs and symptoms of acute coronary syndrome inclusive of chest pain."

As discussed in more detail above, a Chapter 74 expert report must explain "to a reasonable degree, how and why the breach [of the standard of care] caused the injury based on the facts presented." *Acharya*, 2019 WL 1923213, at *5 (quoting *Mitchell*, 2015 WL 3765771, at *4 (internal quotations omitted)).

Dr. Turbay provides significant detail regarding how Frisco ER's alleged breaches proximately caused Rex's death. Specifically, Dr. Turbay's report includes, in part:

> Given the clinical presentation of [Rex] and the presence of underlying hypertension (HTN), a thorough evaluation following the CPS guidelines was necessary. If the evaluation had been performed most likely it would have led to an invasive evaluation of the coronary anatomy and a subsequent diagnosis within 24 hours of the severe CAD found in the autopsy. After the diagnosis is made, appropriate medical therapy would have been initiated to improve the patient's symptoms and stabilize his condition with a simultaneous recommendation for a cardiothoracic surgeon (CTS) consultation to perform a surgical revascularization with a coronary artery bypass graft (CABG) to prolong [Rex's] life. Given the age and the body habitus of [Rex], along with the absence of comorbidities, his outcome after surgical revascularization would have been excellent. The surgical risk for CTS patients is calculated using the Society of Thoracic Surgeon's score (STS) and [Rex's] score would give him a >99% chance of survival after the surgery.

Dr. Turbay's report provides a fair summary of his opinions regarding the causal relationship between the failure to follow the diagnostic and treatment guidelines and Rex's death. *See Abshire*, 563 S.W.3d at 225–26. We conclude that

Dr. Turbay's opinions regarding why Frisco ER's failure to evaluate Rex prevented him from receiving life-saving treatment that would have been apparent based upon the clinical findings seen in the autopsy "adequately explain[ ] the links in the causal chain." *See Abshire*, 563 S.W.3d at 225. We decide Frisco ER's final sub-issue against it.

## CONCLUSION

We affirm the trial court's judgment.

240371f.p05

/Maricela Breedlove/
MARICELA BREEDLOVE
JUSTICE



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

FRISCO ER FACILITY, LLC D/B/A FRISCO ER, Appellant

No. 05-24-00371-CV     V.

SUMER MCCARLEY INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF REX MCCARLEY (DECEASED), Appellees

On Appeal from the 429th Judicial District Court, Collin County, Texas Trial Court Cause No. 429-05327-2023.
Opinion delivered by Justice Breedlove. Justices Molberg and Kennedy participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellees SUMER MCCARLEY INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF REX MCCARLEY (DECEASED) recover their costs of this appeal from appellant FRISCO ER FACILITY, LLC D/B/A FRISCO ER.

Judgment entered this 12th day of November, 2024.